UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

DARCY BELYEA,

                Plaintiff,

       v.

THE CITY OF GLEN COVE and
TIMOTHY TENKE *in his individual and official
capacities*,

                Defendants.

-------------------------------------------------------------

**<u>MEMORANDUM & ORDER</u>**
20-CV-5675 (MKB)

MARGO K. BRODIE, United States District Judge:

I.    Background ................................................................................................ 3

   a.   The parties ........................................................................................... 3

   b.   Plaintiff's early employment with the City.......................................... 3

   c.   2018 actions alleged by Plaintiff ........................................................ 4

   d.   2019 actions alleged by Plaintiff ........................................................ 6

   e.   2020 actions alleged by Plaintiff ........................................................ 8

II.   Discussion ............................................................................................... 10

   a.   Standard of review ............................................................................ 10

   b.   Consideration of documents other than the Complaint...................... 10

   c.   Title VII claims against the City ....................................................... 15

       i.   Timeliness .................................................................................. 15

       ii.   Exhaustion of administrative remedies ...................................... 18

       iii.   Hostile work environment claim ................................................ 22

       iv.   Retaliation ................................................................................. 25

          1.   Participation in a protected activity ...................................... 28

          2.   Adverse employment action ................................................. 29

          3.   Causal connection between protected activity and adverse employment actions..... 31

   d.   NYSHRL hostile work environment and retaliation claims against Tenke..................... 35

   e.   Section 1983 claims against both Defendants .................................... 37

       i.   Tenke's claims of legislative and qualified immunity............................. 38

        1.      Legislative immunity ............................................................. 38

        2.      Qualified immunity................................................................ 42

    ii.     Personal involvement of Tenke ...................................................... 44

    iii.    First Amendment claims against Tenke and the City ................................ 47

        1.      First Amendment retaliation claim on the basis of Plaintiff's gender discrimination complaint....................................................................................... 49

            A.      Plaintiff sufficiently alleges that she engaged in protected speech when she issued a press release .......................................................................... 49

                (1)     Plaintiff's internal complaint ........................................................ 50

                (2)     Plaintiff's press release ............................................................... 51

                1.      Plaintiff plausibly spoke as a citizen .............................................. 51

                2.      Plaintiff spoke on a matter of public concern................................... 52

            B.      Plaintiff alleges that she suffered adverse employment actions......................... 54

            C.      Plaintiff sufficiently alleges causation ............................................. 56

        2.      First Amendment political retaliation ...................................................... 58

    iv.     Fourteenth Amendment claims......................................................... 62

    v.      The City's *Monell* liability ............................................................ 63

    f.      Punitive damages .............................................................................. 68

III.    Conclusion ............................................................................................ 69

Plaintiff Darcy Belyea commenced the above-captioned action on November 20, 2020, (Compl., Docket Entry No. 1), against Defendants the City of Glen Cove (the "City") and Timothy Tenke, in his individual and official capacities as the mayor of Glen Cove.  Plaintiff alleges claims of gender discrimination, retaliation, hostile work environment and free speech violations pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and 42 U.S.C. § 1983, based on her workplace environment and her termination as Recreation Director from the City during Tenke's tenure as mayor.  (*Id.* ¶¶ 10, 26, 115–27.)

The City and Tenke separately move to dismiss the claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]  Plaintiff opposes the motions.[2]  For the reasons set forth below, the Court grants in part and denies in part Defendants' motions to dismiss.

## I.   Background

The Court assumes the truth of the factual allegations in the Complaint for the purposes of this Memorandum and Order.

### a.   The parties

Plaintiff is a female residing in Glen Cove in Nassau County, New York.  (Compl. ¶ 6.) The City employs hundreds of employees and operates approximately nineteen departments to administer the city government.  (*Id.* ¶ 8.)  Tenke, a Democrat, is the mayor and chief executive officer and a resident of Nassau County.  (*Id.* ¶¶ 9, 27.)

### b.   Plaintiff's early employment with the City

The City hired Plaintiff as the Recreation Director in November of 1996, and Plaintiff began her first day of work on January 2, 1997.  (*Id.* ¶¶ 10–11.)  Recreation Director is a civil service position, subject to the rules and requirements of New York's Civil Service laws and regulations.  (*Id.* ¶ 12.)  The Recreation Director position is not appointed annually, unlike some other department head positions, and "exercises general supervision over" and has responsibility

---

[1]  (City's Mot. to Dismiss ("City's Mot."), Docket Entry No. 12; City's Mem. in Supp. of City's Mot. ("City's Mem."), Docket Entry No. 12-2; City's Reply in Further Supp. of City's Mot. ("City's Reply"), Docket Entry No. 17; Tenke's Mot. to Dismiss ("Tenke's Mot."), Docket Entry No. 13; Tenke's Mem. in Supp. of Tenke's Mot. ("Tenke's Mem."), Docket Entry No. 13-10; Tenke's Reply in Further Supp. of Tenke's Mot. ("Tenke's Reply"), Docket Entry No. 18.)

[2]  (Pl.'s Mem in Opp. to City's Mot. ("Pl.'s City Opp'n"), Docket Entry No. 15; Pl.'s Mem. in Opp. to Tenke's Mot. ("Pl.'s Tenke Opp'n"), Docket Entry No. 14.)

for the City's recreational areas, playgrounds, and programs, including City recreational events. (*Id.* ¶¶ 15–16.)  Plaintiff is a member of the collective bargaining unit, identified as "CSEA." (*Id.* ¶ 17.)  After a brief period of probation, Plaintiff became a permanent employee, and the position was then "controlled by N.Y. Civil Service Law § 75 ('Section 75')."  (*Id.* ¶ 13.) Section 75 prohibits the City from terminating an employee without first issuing charges and then providing a hearing on the charges, with some exceptions.  (*Id.* ¶ 14.)

For the first twenty-one years of her employment, Plaintiff performed her job "in an exemplary manner."  (*Id.* ¶ 18.)  Plaintiff was "not disciplined or reprimanded, and her personnel record [was] unblemished."  (*Id.* ¶ 19.)  From 1997 to 2017, Plaintiff worked "successfully" with four different administrations from both major political parties.  (*Id.* ¶ 20.)  Residents have "lauded" her work performance.  (*Id.* ¶¶ 22–23.)

In January of 2016, the CSEA instructed then-mayor Reginald Spinello to remove Plaintiff as a dues-paying member of the CSEA.  (*Id.* ¶ 24.)  Spinello declined to take action because he believed the issue "was really between [Plaintiff] and the union."  (*Id.* ¶ 25.)

Plaintiff's work conditions "changed for the worse" "[a]lmost immediately" after Tenke took office as mayor in January of 2018 and City officials worked to undermine and circumvent her.  (*Id.* ¶¶ 28–29.)  For example, that month, Tenke and the deputy mayor, Maureen Basdavanos, sought to amend parking regulations at the City stadium parking lot, and although Plaintiff "should have been involved in such discussions," Tenke and Basdavanos excluded her. (*Id.* ¶¶ 30–31.)

### c.   2018 actions alleged by Plaintiff

In February of 2018, a "close friend and ally of Tenke," Michael Cervini, began a "campaign of disinformation about [Plaintiff]'s work leading the renovation of the City's batting

cages." (*Id.* ¶ 32.) Cervini publicly criticized Plaintiff's work but praised the mayor, including in a full-page advertisement in the local newspaper. (*Id.* ¶ 34.) Plaintiff asked Tenke to confront Cervini, but the conduct did not stop.[3] (*Id.* ¶ 36.)

At a City Council meeting in July of 2018, Basdavanos' husband accused Plaintiff of not caring about the safety of residents and stated that she should be fired because she did not staff "sufficient lifeguards" for the beaches. (*Id.* ¶ 38.) At that time, there was an ongoing national lifeguard shortage, which was affecting municipalities across Long Island. (*Id.* ¶ 39.)

That summer, a citizen requested documents concerning bathroom renovations being supervised by Plaintiff pursuant to the Freedom of Information Law ("FOIL"). (*Id.* ¶ 40.) Instead of "allowing the FOIL request to proceed in the normal course," Basdavanos sent the documents directly to the resident, who used these documents "to allege that [Plaintiff] should be fired for mismanaging the project." (*Id.* ¶ 41.) Plaintiff contends that the project was "doomed" because of a defunct outside contractor, and that although she had sought assistance from Tenke, the city attorney, and the building department to force the contractor's hand in completing the work, they took no action, leaving Plaintiff to "take the blame for the contractor's failures." (*Id.* ¶¶ 42–43.)

Plaintiff contends that these issues were directed at her based on her gender, because "historically," the mayor supported male employees and would "maintain order at meetings and other events" when residents criticized these employees but did not do the same for Plaintiff. (*Id.* ¶ 45.) In addition, male employees were not reprimanded or criticized for serious misconduct, while Defendants "tacitly condoned and/or provoked" residents' unwarranted criticisms of Plaintiff. (*Id.*) Examples of male employees receiving better treatment included a

---

[3] Plaintiff does not allege "whether Tenke took action or not." (Compl. ¶ 36.)

male employee causing the City to spend more than half a million dollars in health insurance premiums for retirees not entitled to receive these benefits and not being reprimanded, and a male employee not being reprimanded or disciplined for unlawfully switching license plates on City vehicles, one of which was used for non-work-related purposes and involved in an accident. (*Id.* ¶ 46.)

In December of 2018, Tenke attempted to fire the City's controller, Sandra Clarson, but was unable to do so because it would have violated the City Charter. (*Id.* ¶¶ 47–48.) The following summer, *Newsday* reported that Tenke's paychecks did not include certain required deductions for health insurance benefits, but Tenke alleged he was not aware of the error and blamed Clarson's office, saying that this was "what happen[ed] when a duly elected mayor [was] forced to use a holdover political appointee to provide financial checks and balances for the [C]ity." (*Id.* ¶¶ 49–52.) He called this "pure obstructionist politics." (*Id.* ¶ 52.) Tenke attempted to fire Clarson again while she was on vacation, but Clarson temporarily returned to work following an order by a Nassau County Court judge. (*Id.* ¶¶ 54–55.)

### d.  2019 actions alleged by Plaintiff

In August of 2019, the CSEA asked Tenke to remove Plaintiff's CSEA member status and cease collecting her union dues, as the union was concerned that Plaintiff had brought Section 75 charges against a subordinate CSEA employee for misconduct and believed that such conduct compelled her dismissal from the union. (*Id.* ¶¶ 56–57.) Tenke immediately acquiesced to the demand and revoked Plaintiff's membership. (*Id.* ¶ 58.) Two weeks later, Plaintiff met with CSEA officials to explain her position, and the CSEA retracted its prior demand and told Tenke that he should reinstate Plaintiff. (*Id.* ¶¶ 59–60.)

On October 2, 2019, Clarson, who by then was no longer the City controller, together with Plaintiff, issued a press release concerning "ongoing sex discrimination and harassment of female City employees." (*Id.* ¶ 61.) A friend who had worked with the previous Republican administration assisted in issuing the press release. (*Id.* ¶¶ 62–63.) Tenke refuted the claims and asserted that Plaintiff's press release was a "political attack." (*Id.* ¶ 68.) Councilwoman Marsha Silverman also believed that the press release was "politically motivated and unsubstantiated." (*Id.* ¶ 69.) *Newsday* reported on the story on October 17, 2019. (*Id.* ¶ 70.) On October 15, 2019, Plaintiff sent a letter to a City personnel officer, John Charon, "detailing much of [Plaintiff's] mistreatment from January [of] 2018 to then" and alleging that the treatment was based on "gender bias." (*Id.* ¶ 64.) The letter outlined the basis for Plaintiff's discrimination allegations, and, in addition, noted that:

> There is a serious and dangerous pattern of proficient and accomplished women working in this administration that are consistently harassed and bullied. Yet, male employees are not reprimanded in any way, even when their offenses are clearly blatant insubordination or border on criminal.

(*Id.* ¶ 65.)

The City did not include Plaintiff in budget talks in the fall of 2019, even though department heads, including Plaintiff, were traditionally involved in budget discussions. (*Id.* ¶¶ 75–77.) In November of 2019, Tenke and other City officials met to discuss one of the City's recreation areas, but Plaintiff was not included in the meeting. (*Id.* ¶¶ 78–79.) At the meeting Tenke announced that Plaintiff would not be working for the City in 2020 and that the Parks Department would be folded into the Department of Public Works (the "DPW"). (*Id.* ¶ 80.) Plaintiff alleges that "Tenke was laying the groundwork to remove [her] in one of the only ways permitted by the Civil Service rules." (*Id.* ¶ 81.)

On December 19, 2019, attorneys for the City contacted Plaintiff, acknowledging receipt of her complaint and setting up twelve hours of interviews to discuss her allegations of sex discrimination.  (*Id.* ¶ 82.)  Within weeks, Tenke began "stripping" Plaintiff of her duties.  (*Id.* ¶ 83.)  For example, on December 31, 2019, Plaintiff was told that one of her employees responsible for a major department project was being reassigned to the DPW.  (*Id.* ¶ 84.)  On January 8, 2020, City officials excluded Plaintiff from a vendor meeting concerning contamination at one of the beaches under her supervision, and the next day, DPW employees told her she had to turn over her files concerning the contamination project.  (*Id.* ¶¶ 85–86.)  When Plaintiff asked why, the employees "blamed" Basdavanos and Grant Newburger, the Public Relations officer.  (*Id.* ¶ 87.)

### e.   2020 actions alleged by Plaintiff

On January 13, 2020, Plaintiff spoke with Louis Saulino, the DPW director, about the contamination project.  (*Id.* ¶ 88.)  Saulino told Plaintiff that he needed her in the meetings, was "aggravated" by Tenke's handling of the meetings and exclusion of Plaintiff from the meetings, and wanted nothing to do with assuming any of Plaintiff's responsibilities, as he had enough work "on [his] plate."  (*Id.* ¶ 89.)  Saulino spoke with Tenke about including Plaintiff in the contamination meetings and Tenke agreed but insisted that Plaintiff should remain excluded from other project meetings, such as a bathroom renovation project at one of her parks.  (*Id.* ¶¶ 90–91.)

Several days later, a member of one of the City's sports leagues informed Plaintiff that City residents had heard that the City intended to move her Department's office location to the basement of City Hall or off-site.  (*Id.* ¶¶ 92–93.)

On March 9, 2020, shortly after the Covid-19 pandemic began, the City convened a meeting across departments to discuss the City's plan for the pandemic.  (*Id.* ¶¶ 94–95.)  Even though Plaintiff's department supervised events and sports leagues with hundreds of participants, Plaintiff was excluded from this meeting and from the information provided at that meeting about the City's Covid-19 response plan.  (*Id.* ¶ 97.)

On May 5, 2020, Tenke ordered the auxiliary police to change the locks on a park facility.  (*Id.* ¶ 98.)  On July 28, 2020, Tenke proposed a resolution to publicize the results of the City's investigation into Plaintiff's complaints of discrimination, although Plaintiff alleges that "such documents should have remained confidential parts of the employee personnel file."  (*Id.* ¶ 99.)

On October 9, 2020, Tenke told Plaintiff he was eliminating her position from the 2021 budget.  (*Id.* ¶ 101.)  Tenke asserted that the City was facing budget issues and that layoffs were the only solution.  (*Id.* ¶ 104.)  Plaintiff was the only department head terminated.  (*Id.* ¶ 103.)  In October of 2020, the City Council met and discussed the proposed budget, which included the layoffs.  (*Id.* ¶ 105.)  Several Council members pointed out other ways to reduce costs, but Tenke rejected those alternatives as "not viable."  (*Id.* ¶ 106.)  Tenke did not approach the CSEA, which could have offered cost-saving concessions, and did not approach department heads, who were usually asked to provide input about reducing budget costs.  (*Id.* ¶¶ 107–08.)  In addition to Plaintiff, five low-level laborers or clerks were set to be laid off.  (*Id.* ¶ 109.)

Plaintiff contends that Defendants' actions have caused her to suffer from insomnia, headaches, dizzy spells, and weight gain.  (*Id.* ¶ 114.)

## II.   Discussion

### a.   Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021); *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (same).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (same).

### b.   Consideration of documents other than the Complaint

In support of his motion to dismiss, Tenke has submitted a number of documents and files that are not attached to the Complaint and asserts that the Court should consider them because they are public records and documents referenced in Plaintiff's Complaint.  (Tenke's Mem. 10–11; Tenke's Reply 1–2.)

Plaintiff argues that the documents submitted are unauthenticated, and even if they were authenticated, several documents are not heavily relied upon "to frame the Complaint" and are "all tangential to the central issues."  (Pl.'s Tenke Opp'n 6–8.)

10

In deciding a Rule 12(b)(6) motion, "the district court is normally required to look only to the allegations on the face of the complaint" but "may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)); *see Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (holding that courts may consider on a motion to dismiss "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" and other documents "integral" to the complaint (first quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); and then quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010))); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) ("A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." (alteration in original) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004))).  Disputes regarding the authenticity or accuracy of documents preclude a court's consideration on a motion to dismiss.  *See DiFolco*, 622 F.3d at 111 (stating that to consider documentary evidence on a motion to dismiss, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006))); *Beer*, 463 F.3d at 134 ("[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." (first citing *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); and then citing *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001))); *Structured Asset Sales, LLC v. Sheeran*, No. 20-CV-4329, 2021 WL 1199495, at *5 (S.D.N.Y. Mar. 30, 2021) (same); *DeLeon v. Teamsters*

11

*Loc. 802*, *LLC*, No. 20-CV-24, 2021 WL 1193191, at *8 (E.D.N.Y. Mar. 29, 2021) (same);

*F.D.I.C. v. U.S. Mortg. Corp.*, 132 F. Supp. 3d 369, 381 (E.D.N.Y. 2015) (stating that in order to

consider documentary evidence on a motion to dismiss, "it must be clear on the record that no

dispute exists regarding the authenticity or accuracy of the document" and that "even implicit,

conclusory, contradictory, or implausible objections to the authenticity or accuracy of a

document render consideration impermissible" (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209,

221 (N.D.N.Y. 2014))).

In addition to his memorandum of law in support of his motion to dismiss, Tenke has

submitted (and the City also relies on, (*see* City's Mem.)) several documents Defendants contend

are referenced in the Complaint: (1) an advertisement placed by Cervini in a local newspaper,

which Defendants also claim is a matter of public record; (2) a copy of correspondence between

CSEA and the City; (3) a copy of Plaintiff's internal workplace harassment complaint submitted

to the City on October 15, 2019; and (4) a copy of the findings of the investigation of Plaintiff's

harassment complaint.[4]  In addition, Defendants rely on several other documents that they

contend are matters of public record: (1) copies of the minutes of the October 27, 2020 City

Council meeting and 2021 budget adopted at that meeting, which Defendants also claim are

referenced in the Complaint; (2) a copy of a July 18, 2019 *Newsday* article, which Defendants

also claim is referenced in the Complaint; and (3) a copy of Plaintiff's Charge of Discrimination

filed with the Equal Employment Opportunity Commission (the "EEOC Charge"), dated March

---

[4] (*See* Advertisement, annexed to Decl. of Mark Radi ("Radi Decl.) as Ex. B, Docket Entry No. 13-3; Correspondence, annexed to Radi Decl. as Ex. C, Docket Entry No. 13-4; Workplace Harassment Compl., annexed to Radi Decl. as Ex. D, Docket Entry No. 13-5; Findings of Workplace Harassment Compl., annexed to Radi Decl. as Ex. E, Docket Entry No. 13-6.)

13, 2020.[5]  Tenke has also embedded several links to City Council meetings on a video hosting

platform, "Vimeo," a link to an article in the *Long Island Herald*, and the City Charter.  (*See*

*generally* Tenke's Mem. 3–9.)

      The Court takes judicial notice of the EEOC Charge, City Charter, copies of the October

27, 2020 City Council meeting minutes[6] — including the 2021 budget adopted at that meeting —

and the July 18, 2019 *Newsday* article, as they are matters of public record.  *See Lively v.*

*WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021) ("[T]he district court may have

taken judicial notice that [the complainant] filed complaints with the EEOC and in federal court .

. . ." (citing *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014))); *see also Mike v. Drug*

*Enforcement Admin.*, No. 19-CV-5407, 2022 WL 992528, at *4 n.11 (E.D.N.Y. Mar. 31, 2022)

("[T]he [c]ourt takes judicial notice of the fact of the publication . . . in *USA Today*."); *King v.*

*City of New York*, --- F. Supp. 3d ---, ---, 2022 WL 138009, at *4 (S.D.N.Y. Jan. 14, 2022) ("On

a motion to dismiss, the Court may consider documents that are attached as exhibits,

incorporated by reference, or integral to the complaint.  It may also take judicial notice of public

records, such as complaints filed in state court and city council minutes." (citation omitted));

*Elite Union Installations, LLC v. National Fire Ins. Co.*, 559 F. Supp. 3d 211, 218 (S.D.N.Y.

---

[5]  (*See* Min. dated Oct. 27, 2020, annexed to Decl. of Mark Radi ("Radi Decl.) as Ex. F, Docket Entry No. 13-7; *Newsday* article dated July 18, 2019, annexed to Radi Decl. as Ex. G, Docket Entry No. 13-8; EEOC Charge, annexed to Radi Decl. as Ex. H, Docket Entry No. 13-9.)

[6]  Other courts in this Circuit have considered City Council minutes matters of public record.  *See King v. City of New York*, --- F. Supp. 3d ---, ---, 2022 WL 138009, at *4 (S.D.N.Y. Jan. 14, 2022) ("On a motion to dismiss, the Court may consider documents that are attached as exhibits, incorporated by reference, or integral to the complaint.  It may also take judicial notice of public records, such as complaints filed in state court and city council minutes." (citation omitted)); *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 696 n.3 (S.D.N.Y. 2011) ("Second, the minutes and recordings of the City Council meetings are matters of public record and therefore are the types of materials of which a court may take judicial notice.") (collecting cases).

2021) ("Courts may also 'take judicial notice of certain matters of public record . . . includ[ing] 'things such as statutes, case law, city charters, city ordinances, criminal case dispositions, letter decisions of government agencies, published reports, [and] records of administrative agencies.'" (first quoting *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015); and then quoting *Rahman v. Schriro*, 22 F. Supp. 3d 305, 311 (S.D.N.Y. 2014))); *Roth*, 489 F.3d at 509 (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)); *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 206 (S.D.N.Y. 2015) (noting that "when a court takes judicial notice of documents in the public record at the [m]otion [t]o [d]ismiss stage," it may consider them "only to establish their existence and legal effect[ ] or to determine what statements they contain[ ] [but] not for the truth of the matters asserted" (quoting *Liang v. City of New York*, No. 10-CV-3089, 2013 WL 5366394, at *5 (E.D.N.Y. Sept. 24, 2013))); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 & n.4 (S.D.N.Y. 2008) (taking judicial notice of several news articles, including magazines and noting that the court "may take judicial notice of newspaper articles for the fact of their publication" (quoting *In re Merrill Lynch & Co.*, 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003))), *aff'd*, 347 F. App'x 665 (2d Cir. 2009).

The Court declines to consider the other documents and videos because Plaintiff disputes their authenticity. *See Faulkner*, 463 F.3d at 134 (noting that courts may not consider extrinsic materials on a motion to dismiss where the authenticity is disputed on the record); *see Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 719–20 (S.D.N.Y. 2015) (rejecting videos where their authenticity was disputed even assuming they were integral); *Alvarez v. County of Orange*, 95 F. Supp. 3d 385, 397–98 (S.D.N.Y. 2015) (rejecting incident report, depositions, and misdemeanor complaint because they were disputed).

14

The Court also declines to convert these motions to dismiss into motions for summary judgment in light of Plaintiff's request for the parties to conduct discovery and submit additional materials, (Pl.'s Tenke Opp'n 7 n.3), as the parties have not been given a "reasonable opportunity to present all [pertinent] material." *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008) (quoting Fed. R. Civ. P. 12(d)) (reversing the district court's decision where the district court did not permit submission of all pertinent materials before converting motion to dismiss into motion for summary judgment).

### c.   Title VII claims against the City

The City argues that Plaintiff's Title VII hostile work environment and retaliation claims fail because several of her alleged acts are time-barred, she has failed to exhaust her administrative remedies, and she fails to state hostile work environment or retaliation claims.

#### i.   Timeliness

The City argues that the Court should dismiss Plaintiff's Title VII claims to the extent that her claims are based on incidents that occurred more than 300 days before Plaintiff filed the EEOC Charge.  (City's Mem. 2–4.)  Because Plaintiff filed the EEOC Charge on March 13, 2020, the City contends that she cannot base her claims on any alleged discrete events that occurred before May 18, 2019, 300 days prior to that date, including the City's January 2018 failed attempt to amend parking regulations; public criticism by Cervini in February of 2018; public criticism by Basdavanos in July of 2018; and the City's summer 2018 response to a FOIL request.  (*Id.* at 3.)

Plaintiff argues that discriminatory acts which may fall outside the statute of limitations are not time-barred if those acts are part of the "same unlawful employment practice and at least one act falls within the time period."  (Pl.'s City Opp'n 3–4 (quoting *Davis-Garett v. Urban*

*Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019)).)  In support, Plaintiff argues that because the

Complaint alleges ongoing harassment based on her sex, her claims are timely under

*Davis-Garett*.  (*Id.*)

 In New York, a federal employment discrimination claim is time-barred unless the

plaintiff first files an EEOC charge within 300 days of the alleged discrimination.  42 U.S.C.

§ 2000e-5(e)(1); *Rasko v. N.Y.C. Admin. for Children's Servs.*, 734 F. App'x 52, 54 (2d Cir.

2018) ("Under Title VII, a plaintiff in New York must file a complaint with the EEOC within

300 days of a discriminatory act." (first citing 42 U.S.C. 2000e-5(e)(1); and then citing *Pikulin v.*

*City Univ. of N.Y.*, 176 F.3d 598, 599 (2d Cir. 1999))); *Vega v. Hempstead Union Free Sch.*

*Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-5(e)(1)); *McGullam v.*

*Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010).  This requirement is analogous to a statute

of limitations.  *Vega*, 801 F.3d at 79; *Patterson v. County of Oneida*, 375 F.3d 206, 220 (2d Cir.

2004) (dismissing as untimely claims based on conduct that occurred more than 300 days prior to

the filing of EEOC charge).

 "[E]xpiration of the limitations period does not bar 'an employee from using the prior

acts as background evidence in support of a timely claim.'"  *Davis-Garett*, 921 F.3d at 42; *see*

*Davidson v. LaGrange Fire Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013) (holding that allegations

concerning conduct that took place during the time-barred period may also be considered as

"'background evidence' in evaluating the merits of [a plaintiff's] discrimination claims" (citing

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002)); *Chin v. Port Auth. of N.Y. &*

*N.J.*, 685 F.3d 135, 150 (2d Cir. 2012) (explaining that background evidence from outside the

limitations period "may be considered to assess liability on the timely alleged act" (quoting *Jute*

*v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005))); *Everett v. N.Y.C. Dep't of*

*Educ.*, No. 21-CV-7043, 2022 WL 2342693, at *5 (S.D.N.Y. June 29, 2022) (considering acts

outside of the statute of limitations as "background evidence"); *McGrier v. Cap. Cardiology*, No.

20-CV-1044, 2022 WL 2105854, at *7 (N.D.N.Y. June 10, 2022) ("Though time-barred, discrete

prior acts falling outside the limitations period may be used as 'background evidence in support

of a timely claim.'" (quoting *Morgan*, 536 U.S. at 113)); *Marzano v. S. New England Tel. Co.*,

No. 16-CV-1274, 2018 WL 4341149, at *2 (D. Conn. Sept. 10, 2018) ("Of course, evidence of

prior events may be considered for background purposes to the extent that they may shed light on

the significance of events occurring within the statute of limitations period."); *Johnson v. Conn.*

*Dep't of Admin. Servs. Bureau of Enter. Sys. & Tech.*, No. 17-CV-00901, 2018 WL 306697, at

*4 (D. Conn. Jan. 5, 2018) ("[A]ny adverse acts that occurred prior to [the statute of limitations

period] may be considered . . . only as background evidence to support any non-time-barred acts

of discrimination or retaliation."); *Imperato v. Otsego Cnty. Sheriff's Dep't*, No. 13-CV-1594,

2016 WL 1466545, at *14 (N.D.N.Y. Apr. 16, 2016) ("The statute of limitations does not . . . bar

an employee from using . . . prior acts as background evidence in support of a timely claim."

(quoting *Morgan*, 536 U.S. at 113)).

  In addition, a hostile work environment claim by its very nature involves repeated

conduct over time rather than a discrete occurrence on a particular day. *See, e.g.*, *Ferraro v.*

*N.Y.C. Dep't of Educ.*, No. 13-CV-5837, 2015 WL 1476392, at *7 (E.D.N.Y. Mar. 31, 2015)

(quoting *Morgan*, 536 U.S. at 115). Such a claim is timely if at least one act contributing to the

claim occurred within the limitations period. *See Yu v. City of New York*, 792 F. App'x 117, 118

(2d Cir. 2020) ("For hostile work environment claims, only one alleged act must fall within the

statute of limitations, and so long as that act is part of the same unlawful practice as the earlier

acts, the entire period of hostile environment may be considered."); *Patterson*, 375 F.3d at 220

(citing *Morgan*, 536 U.S. at 117) (same).

In her EEOC Charge, Plaintiff wrote that she was subjected to retaliation and

discriminated against, has been "consistently and repeatedly harassed, belittled[,] and blocked

from performing [her] job duties since January 17, 2018," filed a complaint with her employer,

which was ignored, and was "treated . . . poorly." (EEOC Charge at 1.)  The City concedes

several timely acts, (City's Mem. 3–4), which are part of the unlawful employment practices.

Accordingly, the acts alleged in the Complaint prior to May 18, 2019 — the failure to be

included in discussions about the parking spaces, (Compl. ¶ 31); public criticism by Cervini

regarding the renovations of the City's batting cages, (*id.* ¶ 34); public criticism from

Basdavanos' husband that Plaintiff should be fired because she did not staff "sufficient

lifeguards" for the beaches, (*id.* ¶ 38); and the City's response to a FOIL request, (*id.* ¶¶ 40–43)

— while untimely as discrete acts, are all part of Plaintiff's hostile work environment claim, and

therefore are timely for purposes of Plaintiff's hostile work environment claim.[7]

### ii.  Exhaustion of administrative remedies

The City argues that the Court should dismiss Plaintiff's Title VII claims because she

"failed to timely exhaust [her] administrative remedies" with the EEOC.  (City's Mem. 2–4.)

The City argues that Plaintiff fails to exhaust her claims as to: (1) her removal and reinstatement

to the union in August of 2019, (2) her exclusion from meetings and project reassignment in late

---

[7]  While discrete acts taking place prior to May 18, 2019 are time-barred for purposes of
Plaintiff's Title VII retaliation claim, *see Yu v. City of New York*, 792 F. App'x 117, 118 (2d Cir.
2020) (affirming district court's ruling that Title VII disparate treatment and retaliation claims
were time-barred), the Court nevertheless remains free to consider the discrete acts as
"background evidence" for purposes of Plaintiff's retaliation claim.  *Davidson v. LaGrange Fire
Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013).

2019 and 2020, and (3) the elimination of her position in October of 2020, effective January of

2021, because she never presented any of these allegations to the EEOC.  (*Id.* at 3–4.)

Plaintiff contends that she exhausted her administrative remedies because her claims are

"reasonably related" to those presented in the EEOC charge.  (Pl.'s City Opp'n 4–5 (quoting

*Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)).)

Under Title VII, a complainant must "exhaust" her administrative remedies by filing a

complaint with the EEOC or an authorized state agency prior to the commencement of a Title

VII action in federal court, and that complaint must name the defendant.  *See Edo v. Antika*

*Pizzeria Astoria, Inc.*, 852 F. App'x 618, 619 (2d Cir. 2021) ("Before an individual may bring a

Title VII suit in federal court, the claims forming the basis of such a suit must first be presented

in a complaint to the EEOC or the equivalent state agency." (quoting *Williams v. N.Y.C. Hous.*

*Auth.*, 458 F.3d 67, 69 (2d Cir. 2006))); *McPartlan-Hurson v. Westchester Cmty. Coll.*, 804 F.

App'x 41, 43 (2d Cir. 2020) ("Pursuant to Title VII and the ADA, a plaintiff must exhaust her

administrative remedies by filing a charge with the EEOC within 300 days of a discriminatory

act." (citing 42 U.S.C. §§ 2000e-5(e)(1), 12117(a))); *Duplan v. City of New York*, 888 F.3d 612,

624 (2d Cir. 2018) ("Exhaustion is 'an essential element of Title VII's statutory scheme.'"

(quoting *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018))).

However, "[c]laims not raised in an EEOC complaint . . . may be brought in federal court if they

are reasonably related to the claim filed with the agency."  *Zarda v. Altitude Express, Inc.*, 883

F.3d 100, 110 n.5 (2d Cir. 2018) (en banc) (alteration in original) (quoting *Williams*, 458 F.3d at

70), *aff'd sub nom. Bostock v. Clayton County*, 590 U.S. ---, 140 S. Ct. 1731 (2020); *Littlejohn v.*

*City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (same).  "Reasonably related" claims are

recognized in three situations: where (1) the alleged discriminatory conduct "would fall within

the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination'"; (2) the claim is one of "retaliation by an employer against an employee for filing an EEOC charge"; and (3) the plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003); *see also Carter v. New Venture Gear, Inc.*, 310 F. App'x 454, 458 (2d Cir. 2009) (same). "The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on both bases.'" *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 158 (2d Cir. 2008) (quoting *Deravin*, 335 F.3d at 202); *see also Hoffman v. Williamsville Sch. Dist.*, 443 F. App'x 647, 649 (2d Cir. 2011) ("A new allegation will be considered reasonably related if the administrative charge provided the EEOC with sufficient notice to investigate the allegation." (citing *Williams*, 458 F.3d at 70)). Courts look at "factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving" to determine whether the claims are reasonably related. *Littlejohn*, 795 F.3d at 322 (alteration omitted) (quoting *Deravin*, 335 F.3d at 201); *Scott v. N. Manor Multicare Ctr., Inc.*, No. 15-CV-2495, 2018 U.S. Dist. LEXIS 54730, at *17 (S.D.N.Y. Mar. 30, 2018) ("[T]he 'relatedness' analysis is 'intimately connected to the facts asserted in the EEOC complaint,' 'and does not depend on the boxes checked or labels applied by the plaintiff.'" (citation omitted) (first quoting *Williams*, 458 F.3d at 71; and then quoting *Carby v. Holder*, No. 11-CV-5775, 2013 WL 3481722, at *5 (S.D.N.Y. July 10, 2013))).

    In her EEOC Charge, Plaintiff indicated that she had experienced discrimination and retaliation based on her sex. (EEOC Charge at 1.) Plaintiff noted that the discrimination took place on October 10, 2019. (*Id.*) Plaintiff did not check the box indicating that the discrimination was a "continuing action," but when asked to add the particulars of her claim,

Plaintiff specified that she had been subjected to retaliation and discrimination because she is female, and had been "consistently and repeatedly harassed, belitted[,] and blocked from performing [her] job duties since January 17, 2018 and most recently on March 9, 2020." (*Id.*) Plaintiff also wrote that she filed a complaint with her employer, which was ignored, and that she was "treated . . . poorly." (*Id.*)  In addition, Plaintiff noted that the male heads of departments and other male employees were "never questioned, disciplined, undermined[,] or prevented from performing their job duties, nor [were] they harassed or belittled at public meetings," unlike her. (EEOC Charge at 2.)

Plaintiff's timely allegations — removal and reinstatement to the union in August of 2019, exclusion from meetings and project reassignment in late 2019 and 2020, and the elimination of Plaintiff's position in October of 2020, effective January of 2021 — are "reasonably related" to the allegations in the EEOC Charge because the EEOC Charge detailed alleged discriminatory practices, retaliation, and a hostile work environment and provided "adequate notice" to the EEOC based on the dates and actions alleged in the EEOC Charge. *Williams*, 458 F.3d at 70 ("The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice.'"); *see Hoffman*, 443 F. App'x at 649 (ruling that a new allegation will be considered reasonably related if the administrative charge provided the EEOC with sufficient notice to investigate the allegation).  In her Complaint, Plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Terry*, 336 F.3d at 151.  Thus, her allegations identified above "fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Id.*; *see Littlejohn*, 795 F.3d at 322 (same).

21

Accordingly, the Court finds that Plaintiff has exhausted her administrative remedies as to her removal and reinstatement to the union in August of 2019, her exclusion from meetings and project reassignment in late 2019 and 2020, and the elimination of Plaintiff's position in October of 2020, effective January of 2021.

### iii.   Hostile work environment claim

The City argues that Plaintiff fails to state to a hostile work environment claim, as the alleged incidents upon which Plaintiff relies do not amount to severe or pervasive harassment, and are also "bereft" of any factual allegations plausibly demonstrating that the harassing incidents were gender-based.  (City's Mem. 5–7.)

Plaintiff argues that she sufficiently states a hostile work environment claim because the conduct was severely or pervasively abusive and Defendants did not mistreat men.  (Pl.'s City Opp'n 6–8.)

To state a hostile work environment claim, a plaintiff must "show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 309 (2d Cir. 2017) (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014)); *see Duplan*, 888 F.3d at 627 (same); *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (same).  "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive."  *Littlejohn*, 795 F.3d at 321 (quoting *Rasprado v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)).  The Second Circuit has cautioned that:

22

> While the standard for establishing a hostile work environment is high, [the Second Circuit] ha[s] repeatedly cautioned against setting the bar too high, noting that [w]hile a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.

*Terry*, 336 F.3d at 148.  A plaintiff must also show "that the complained of conduct . . . creates such an environment because of the plaintiff's" protected characteristic.  *LeGrand v. Walmart Stores E., LP*, 779 F. App'x 779, 782 (2d Cir. 2019).  A court should consider the totality of the circumstances and factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance."  *Staten v. City of New York*, 653 F. App'x 78, 80 (2d Cir. 2016) (alteration in original) (quoting *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004)); *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).  In evaluating whether a plaintiff states a hostile work environment claim, the court must consider facially neutral conduct that might "bolster a harassment claim" when the facially neutral conduct is by the same individual who engaged in "overt[]" discrimination.  *See Daniel v. T&M Prot. Res., LLC*, 689 F. App'x 1, 3 (2d Cir. 2017) (citing *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547–48 (2d Cir. 2010)) (remanding with instructions to the district court to consider facially neutral incidents of harassment in analyzing the plaintiff's hostile work environment claim).

Based on the totality of the alleged conduct, Plaintiff plausibly alleges a hostile work environment claim on the basis of gender.  Plaintiff claims that over a series of years, the City excluded her from meetings where she would normally be involved as a department head.  (Compl. ¶¶ 31, 85–86.)  Indeed, Plaintiff was excluded from a vendor meeting concerning contamination at one of the beaches under her supervision, (*id.* ¶ 85), and was directed to turn over her files concerning the contamination project, (*id.* ¶ 86).  In addition, one of her employees

responsible for a major department project was reassigned to a different office, (*id.* ¶ 84). Further, following the start of the Covid-19 pandemic, when the City convened a meeting across departments to discuss the City's plan, Plaintiff was excluded from this meeting and from the information provided at that meeting about the City's Covid-19 response plan even though Plaintiff's department supervised events and sports leagues with hundreds of participants.  (*Id.* ¶ 97.)  While ordinarily, exclusions from meetings do not sufficiently allege the level of harassment necessary to support a hostile work environment claim, *see, e.g.*, *Tillery v. N.Y. State Office of Alcoholism & Substance Abuse Services*, 739 F. App'x 23, 27 (2d Cir. 2018) (ruling that plaintiff's allegations that her employer refused to send her to mandatory training, reduced her job responsibilities, and criticized her performance did not constitute a hostile work environment), under the circumstances of this case, Plaintiff adequately alleges an environment where she experienced "harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse."  *Patane*, 508 F.3d at 113. As the Recreation Director, because Plaintiff was responsible for "exercis[ing] general supervision over and responsibility" for the City's recreational areas, playgrounds, and programs, (Compl. ¶ 16), excluding Plaintiff from meetings regarding matters for which she was directly responsible effectively prevented Plaintiff from performing her job duties.[8]  Further, Plaintiff does not allege isolated incidents; rather, the incidents were "sufficiently continuous and concerted" over several years to support a finding that Plaintiff experienced a hostile work

---

[8]  For example, in 2018, Plaintiff was excluded from planning and strategy regarding parking regulations, an issue that directly fell under her responsibilities.  (Compl. ¶¶ 30–31.)  In November of 2019, Plaintiff was also excluded from budget discussions in which she had previously been included and in addition was excluded from a meeting concerning a City recreation area, which fell under her responsibilities.  (*Id.* ¶¶ 76–79.)  In January of 2020, Plaintiff was excluded from a vendor meeting concerning contamination at one of the City's beaches and was ordered to turn over her files regarding the beach.  (*Id.* ¶¶ 85–86.)

environment. *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019); *see Feingold*, 366 F.3d at 150 (holding that an employee experienced pervasive discrimination where he was singled out on an "almost daily" basis through hostile remarks and overt animosity).

Defendants also content that Plaintiff has not sufficiently alleged a hostile work environment on the basis of gender. (City's Mem. 6–7.) However, Plaintiff alleges examples of male employees receiving better treatment, including a male employee causing the City to spend more than half a million dollars in health insurance premiums for retirees not entitled to receive these benefits and not being reprimanded, and a male employee unlawfully switching license plates on City vehicles, one of which was used for non-work related purposes and became involved in an accident, who was also not reprimanded or disciplined. (Compl. ¶ 46.) She further alleges that her gender was the basis for this treatment because "male employees were not reprimanded or criticized in any way for serious misconduct," (*id.* ¶ 45). Plaintiff sufficiently alleges differential treatment based on gender at the pleading stage. *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 79 n.6 (2d Cir. 2010) ("A Title VII sexually hostile work environment claim . . . requires a plaintiff to establish that the conduct at issue occurred 'because of the plaintiff's sex.'" (quoting *Patane*, 508 F.3d at 113)); *Patane*, 508 F.3d at 114 ("[A] plaintiff need only allege that she suffered a hostile work environment because of her gender.").

Accordingly, viewing Plaintiff's allegations in their totality and drawing all inferences in her favor, Plaintiff plausibly alleges a hostile work environment claim.

### iv.   Retaliation

The City argues that Plaintiff fails to plausibly demonstrate that she engaged in protected activity and also argues that, other than the elimination of her position, most of the alleged incidents do not amount to adverse actions. (City's Mem. 8–10.) In addition, the City argues

that, as to the elimination of Plaintiff's position, Plaintiff fails to plausibly allege a causal connection to her complaints of gender discrimination.  (*Id.*)

Plaintiff argues that after she complained about discrimination, City officials "shrugged off" her complaints and then retaliated against her.  (Pl.'s City Opp'n 9–15.)

Title VII prohibits retaliation against an employee who "has opposed any practice [that is] made an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e-3(a).  Claims of retaliation are analyzed under the *McDonnell Douglas* burden shifting analysis.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (applying *McDonnell Douglas* to retaliation claim); *Carr v. N.Y.C. Transit Auth.*, No. 16-CV-9957, 2022 WL 824367, at *12 (S.D.N.Y. Mar. 18, 2022) (same).  At the pleading stage, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation."  *Duplan*, 888 F.3d at 625 (quoting *Littlejohn*, 795 F.3d at 316); *see Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 19 (2d Cir. 2015) (same).  The main question on a motion to dismiss is whether a plaintiff can establish a claim that has "[f]actual allegations [that] raise a right of relief above the speculative level."  *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 512 (S.D.N.Y. 2010) (first alteration in original) (quoting *Twombly*, 550 U.S. at 555); *see also Williams*, 458 F.3d at 71 ("[T]he requirements for establishing a prima facie case under *McDonnell Douglas* [do not] apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." (second alteration in original) (quoting *Swierkiewicz v. Sorema*, 534 U.S. 506, 511 (2002))); *Harris v. Office of N.Y. State Comptroller*, No. 20-CV-8827, 2022 WL 814289, at *17 n.29 (S.D.N.Y. Mar. 17, 2022) ("[T]he allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise

26

under *McDonnell Douglas* in the initial phase of a Title VII litigation." (alteration in original) (quoting *Littlejohn*, 795 F.3d at 316)); *Pompey-Primus v. Success Acad. Charter Sch., Inc.*, No. 21-CV-3981, 2022 WL 504541, at *8 (S.D.N.Y. Feb. 17, 2022) ("Retaliation claims brought under Title VII . . . are analyzed using the *McDonnell Douglas* burden-shifting framework . . . . [A]t the motion to dismiss stage, the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation."); *AB ex rel. CD v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144, 154 (S.D.N.Y. 2004) ("The question that should be considered by this Court in connection with the [motion to dismiss] is whether [the plaintiff] has alleged a prima facie case for retaliation; not whether her claim will survive a *McDonnell Douglas* burden shifting analysis.").

To establish a prima facie case of retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 316 (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). At the pleading stage, the allegations need only give "plausible support to the reduced prima facie requirements." *Id.* "[F]or a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) [the] defendants discriminated — or took an adverse employment action — against [her], (2) because [s]he has opposed any unlawful employment practice." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271 (2d Cir. 2016) (second two alterations in original) (quoting *Vega*, 801 F.3d at 90).

### 1.   Participation in a protected activity

The City argues that Plaintiff fails to plausibly demonstrate that she engaged in protected activity, as her "gripes were premised on personal animus and petty workplace grievances." (City's Mem. 8.)

Plaintiff argues that she reasonably and in good faith believed that she was being treated differently based on her gender and that her complaint was not a general grievance about working conditions, but a discrimination complaint.  (Pl.'s City Opp'n 10–11.)

Filing either a formal or informal complaint challenging discrimination is a protected activity for purposes of retaliation claims under Title VII.  *See Jagmohan v. Long Island R.R. Co.*, 622 F. App'x 61, 63–64 (2d Cir. 2015); *Summa v. Hofstra Univ.*, 708 F.3d 115, 126–27 (2d Cir. 2013).  "A complaint of discrimination constitutes 'protected activity' only if (1) the plaintiff holds a good-faith belief that he suffered discrimination because of a protected characteristic and (2) that belief is reasonable."  *Jagmohan*, 622 F. App'x at 63–64 (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)); *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001) (holding that Title VII "protects employees [who] . . . make[] informal protests of discrimination, including making complaints to management, so long as the employee has 'a good faith, reasonable belief that the underlying challenged actions of the employer violated the law'" (first quoting *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000); and then quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998))).  "[A]ttempts to assert . . . rights against discrimination are protected activities." *Frantti v. New York*, 850 F. App'x 17, 21 (2d Cir. 2021) (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002)).

In or around October of 2019, Plaintiff sent a letter to a City personnel officer, John Charon, detailing her alleged mistreatment and alleging that the treatment was based on "gender bias," and has therefore shown that she opposed unlawful employment practices. (Compl. ¶ 64); *see Frantti*, 850 F. App'x at 21 (holding that efforts to protest discriminatory practices are protected activities). Plaintiff sufficiently alleges that she made "protests of discrimination, including making complaints to management," *Summa*, 708 F.3d at 127, with a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," *Gregory*, 243 F.3d at 701. Private complaints to internal personnel alleging discrimination constitute protected activity. *See Cousar v. New York-Presbyterian/Queens*, No. 16-CV-1784, 2019 WL 4015440, at *15 (E.D.N.Y. Aug. 26, 2019) (finding that emails to human resources staff complaining of discrimination constitute protected activity), *aff'd*, 845 F. App'x 34 (2d Cir. 2021); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010) ("It is clearly established that . . . complaints to supervisors constitute protected activity under Title VII.").

### 2. Adverse employment action

The City argues that most of the acts that Plaintiff alleges are not adverse employment actions, except for the elimination of her position. (City's Mem. 8–10.)

Plaintiff contends that the threat of termination is also an adverse action for purposes of retaliation. (Pl.'s City Opp'n 11.)

Adverse employment actions are actions that "could well have dissuaded a reasonable employee in [the plaintiff's] position from complaining of unlawful discrimination." *Davis-Garett*, 921 F.3d at 44 (first quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006); and then citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "[I]n determining whether conduct amounts to an adverse employment

action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks*, 593 F.3d at 165 (citing *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

Plaintiff alleges that Tenke announced during a November 2019 meeting that Plaintiff would not be working for the City in 2020 and that the Parks Department, which Plaintiff headed, would be folded into the DPW. (*Id.* ¶ 80.) In view of the fact that Plaintiff was ultimately terminated and thus suffered an adverse employment action based on her termination, (Compl. ¶¶ 101, 103), the threat of termination is also an adverse employment action. *Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 254 (W.D.N.Y. 2011) ("[T]hreats of termination or other punishment do not qualify as adverse actions where they were never carried through."); *cf. Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 571 (2d Cir. 2011) (determining that threat of termination fell into category of "trivial harms" and "petty slights or minor annoyances" when the threat was never carried out); *McGrier*, 2022 WL 2105854, at *18 (holding that the threat of termination "without any allegation that would permit an inference that the threat would be carried through" was insufficient to allege an adverse action).

Thus, Tenke's threat of termination in the November 2019 meeting and Plaintiff's termination, authorized in October of 2020 and made effective January of 2021, both constitute adverse employment actions. *See Rivera v. JP Morgan Chase*, 815 F. App'x 603, 608 (2d Cir. 2020) (affirming that an adverse employment action for Title VII retaliation purposes is "any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination," and that standard "covers a broader range of conduct than the adverse-action standard for claims of discrimination"); *O'Toole v. County of Orange*, 255 F. Supp. 3d 433, 442 (S.D.N.Y. 2017) ("Defendant's conduct, considered as a whole, meets the 'objective' standard,

as the 'employment consequences of a negative nature' resulting from making a complaint could

chill other employees from speaking up." (quoting *Cox v. Onondaga Cty. Sheriff's Dep't*, 760

F.3d 139, 147 (2d Cir. 2014))).

### 3.  Causal connection between protected activity and adverse employment actions

The City contends that Plaintiff fails to plausibly allege a causal connection between her

discrimination complaint and the elimination of her position.  (City's Mem. 9–10.)

Plaintiff argues that she has established a causal connection through temporal proximity

and through a pattern of antagonism.  (Pl.'s City Opp'n 11–15.)

To sufficiently plead that a defendant-employer took an adverse employment action

"because" a plaintiff opposed an unlawful employment practice, a plaintiff "must plausibly

allege that the retaliation was a 'but-for' cause of the employer's adverse action."  *Vega*, 801

F.3d at 90 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).  But-for

causation does not require that retaliation "was the only cause of the employer's action, but only

that the adverse action would not have occurred in the absence of the retaliatory motive."  *Id.* at

91 (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)); *Pothen v. Stony

Brook Univ.*, 211 F. Supp. 3d 486, 497 (E.D.N.Y. 2016) (same)).

A causal connection of retaliation can be shown either "(1) indirectly, by showing that

the protected activity was followed closely by discriminatory treatment, or through other

circumstantial evidence such as disparate treatment of fellow employees who engaged in similar

conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by

the defendant."  *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d

111, 117 (2d Cir. 2000)); *see also Terry*, 336 F.3d at 152 ("Proof of such a causal connection

'can be established "directly through evidence of retaliatory animus directed against a plaintiff,"

or "indirectly by showing that the protected activity was followed closely by discriminatory treatment . . . such as disparate treatment of fellow employees who engaged in similar conduct.""" (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 444 (2d Cir. 1999), *abrogated on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006))); *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (same).

"[T]he requirement that [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two." *Feingold*, 366 F.3d at 156–57 (collecting cases); *see also Vega*, 801 F.3d at 90 ("A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." (first citing *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001); and then citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010))); *Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 23 (2d Cir. 2015) ("Ordinarily, causation may be inferred from close temporal proximity."). The Second Circuit has not defined "the outer limits beyond which a temporal relationship is too attenuated to establish causation." *See Gorzynski*, 596 F.3d at 110–11 ("Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship.").

Where defendants are alleged to have retaliated at the first available opportunity, the window of temporal proximity can be extended. *See Grant v. Bethlehem Steel*, 622 F.2d 43, 45–46 (2d Cir. 1980) (holding that plaintiff established causal connection in Title VII retaliation case despite an eight month lapse between the protected activity and the adverse action when the defendant was unable to retaliate any sooner); *Cronin v. St. Lawrence*, No. 08-CV-6346, 2009

32

WL 2391861, at *5 (S.D.N.Y. Aug. 5, 2009) (in the context of First Amendment retaliation, noting that a gap of nearly one year between protected activity and retaliatory action was plausible because defendant "had no earlier opportunity to retaliate against [p]laintiff for engaging in protected activity"); *Blanco v. Brogan*, 620 F. Supp. 2d 546, 556–57 (S.D.N.Y. 2009) (finding a causal connection for purposes of Title VII retaliation where there was a gap of several months between the protected activity and alleged adverse actions because "police departments generally have well-defined procedures and labor union agreements which prevent management from taking arbitrary adverse employment actions against their employees" and "it would have been very difficult for the [p]olice [d]epartment here to retaliate against [the] [p]laintiff during the time period except in terms of promotion"); *McKenzie v. Nicholson*, No. 08-CV-773, 2009 WL 179253, at *5 n.5 (E.D.N.Y. Jan. 26, 2009) ("The Court notes, however, that the Second Circuit has determined that an adverse action could be retaliatory in nature despite a significant time lapse if the employer took action at the first opportunity to do so." (citing *Grant*, 622 F.3d at 45–46)). A "pattern of antagonism" over the intervening period between protected activity and retaliatory treatment may also demonstrate the requisite causal connection. *Duplan*, 888 F.3d at 626 (considering "the facts as a whole" in Title VII retaliation case); *see Maxton v. Underwriter Labs. Inc.*, 4 F. Supp. 3d 534, 548 (E.D.N.Y. 2014) ("According to some courts, a plaintiff may also demonstrate a causal connection by showing a 'pattern of antagonism' over the intervening period." (quoting *Chan v. NYU Downtown Hosp.*, No. 03-CV-3003, 2004 WL 213024, at *3 (S.D.N.Y. Feb. 3, 2004))); *Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10-CV-5612, 2012 WL 3646935, at *14 (E.D.N.Y. Aug. 22, 2012) (same).

On October 15, 2019, Plaintiff sent a letter to a City personnel officer detailing the alleged mistreatment and alleging that the treatment was based on "gender bias," (Compl. ¶ 64),

and within approximately one month at the November 2019 meeting, Tenke announced that Plaintiff would not work for the City in 2020 and that the Parks Department would be folded into the DPW, (*id.* ¶ 80). These facts plausibly allege "temporal proximity between" the October 2019 letter and November 2019 announcement and sufficiently establish a causal connection between Plaintiff's complaints and her threat of termination in November of 2019, which led to her eventual termination in January of 2021. *Feingold*, 366 F.3d at 156–57.

Moreover, although the announcement of Plaintiff's termination in October of 2020, (Compl. ¶¶ 101, 103), was a year after Plaintiff's October 2019 letter detailing her alleged mistreatment, and ordinarily would not support a finding of temporal proximity sufficient to establish causation, because there is evidence of a "pattern of antagonism" against Plaintiff over the intervening period, including the City's "stripping" her of responsibilities between the November 2019 meeting and October of 2020 City Council meeting where Plaintiff's position was ultimately eliminated, (Compl. ¶ 83); Plaintiff being told that one of her employees responsible for a major department project was being reassigned to the DPW, (*id.* ¶ 84); and Plaintiff's exclusion from a vendor meeting concerning contamination at one of the beaches under her supervision and demands from DPW employees that Plaintiff had to turn over her files concerning the contamination project, (*id.* ¶¶ 85–86), the prolonged period does support a finding of temporal proximity. *Duplan*, 888 F.3d at 626; *see Reppert v. N.Y. State Dep't of State*, No. 19-CV-1518, 2021 WL 3165210, at *12 (N.D.N.Y. July 26, 2021) (finding that despite a gap of seventeen months between protected activity and adverse action, "evidence of an intervening pattern of antagonism" supported causality for purposes of the plaintiff's retaliation claim (quoting *Chan*, 2004 WL 213024, at *3)); *Maxton*, 4 F. Supp. 3d at 548 (finding that a pattern of antagonistic actions over a period culminating in adverse action can constitute causal connection

for retaliation purposes).  Thus, Plaintiff has sufficiently alleged temporal proximity to establish

a causal connection between her complaint to the City's personnel officer, the threat to terminate

her, and her actual termination.

Accordingly, viewing Plaintiff's allegations in their totality, Plaintiff sufficiently alleges

that she was subjected to retaliation under Title VII.

### d.   NYSHRL hostile work environment and retaliation claims against Tenke

Tenke argues that the Court must dismiss Plaintiff's NYSHRL hostile work environment

and retaliation claims against him because Plaintiff fails to plausibly allege an underlying

violation, and therefore, there can be no aiding or abetting.  (Tenke's Mem. at 12–13.)

Plaintiff does not address Tenke's aiding and abetting argument, (*see generally* Pl.'s

Tenke Opp'n), but alleges in the Complaint that he subjected her to inferior terms and conditions

of employment based on her gender and took adverse employment actions against her because of

her complaints of workplace discrimination based on gender, (Compl. ¶¶ 124, 127).

In order for a defendant to be liable as an aider and abettor under section 296(6), a

plaintiff must first establish the existence of a primary violation of the NYSHRL by an employer

or principal.  *See Kelly G. v. Bd. of Educ. of City of Yonkers*, 952 N.Y.S.2d 229, 232 (App. Div.

2012); *Strauss v. N.Y. State Dep't of Educ.*, 805 N.Y.S.2d 704, 709 (App. Div. 2005); *Forrest v.

Jewish Guild for the Blind*, 786 N.Y.S.2d 382, 397 (2004); *Baldwin v. Bank of Am., N.A.*, 984

N.Y.S.2d 630 (N.Y. Sup. Ct. 2013); *see also Benson v. Otis Elevator Co.*, 557 F. App'x 74, 77

(2d Cir. 2014); *Falbaum v. Pomerantz*, 19 F. App'x 10, 15 (2d Cir. 2001); *Day v. MTA N.Y.C.

Trans. Auth.*, No. 17-CV-7270, 2021 WL 4481155, at *14 (S.D.N.Y. Sept. 30, 2021)

("[L]iability must first be established as to the employer/principal before accessorial liability can

be found as to an alleged aider and abettor." (alteration in original) (quoting *Jain v. McGraw-Hill*

*Cos., Inc.*, 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011))); *Mereigh v. N.Y. & Presbyterian Hosp.*, No. 16-CV-5583, 2017 WL 5195236, at *7 n.11 (S.D.N.Y. Nov. 9, 2017); *Irons v. Bedford–Stuyvesant Cmty. Legal Servs.*, No. 13-CV-4467, 2015 WL 5692860, at *32 (E.D.N.Y. Sept. 28, 2015); *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013).  This principle applies even when the defendants are entities.  *See Francis v. Kings Park Manor, Inc.*, 91 F. Supp. 3d 420, 434 (E.D.N.Y. 2015) ("Under [section] 296(6), an individual or entity must 'actually participate[] in the conduct giving rise to a discrimination claim' to be held liable." (quoting *DiPilato v. 7–Eleven, Inc*., 662 F. Supp. 2d 333, 353 (S.D.N.Y. 2009))).

Plaintiff brings NYSHRL claims against Tenke, but fails to allege a NYSHRL claim against the City.  (*See* Compl. ¶¶ 124, 127.)  Thus, Plaintiff has failed to establish the existence of a primary violation of the NYSHRL by an employer, and therefore her claims against Tenke fail.  *See Forrest*, 786 N.Y.S.2d at 395 (dismissing a claim against an individual for violation of NYSHRL where plaintiff failed to allege violations against entity); *see also McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 74 (S.D.N.Y. 2020) (finding that the plaintiff adequately pled a claim for aiding and abetting sexual harassment against the individual defendant by pleading claims of sexual harassment against the defendant corporate entity as principal); *France v. Touro Coll.*, No. 14-CV-4613, 2016 WL 1105400, at *9 (E.D.N.Y. Feb. 16, 2016) ("[I]ndividual liability under the NYSHRL cannot attach without corresponding liability for the employer enterprise."), *report and recommendation adopted*, 2016 WL 1117459 (E.D.N.Y. Mar. 21, 2016).

Accordingly, the Court grants Tenke's motion and dismisses Plaintiff's NYSHRL hostile work environment and retaliation claims against him.[9]

### e. Section 1983 claims against both Defendants

Plaintiff brings First Amendment retaliation claims against Tenke and the City, a Fourteenth Amendment hostile work environment claim against both Tenke and the City, and a Fourteenth Amendment retaliation claim against Tenke,[10] all pursuant to section 1983. (Compl. ¶¶ 115–20, 122–23, 126.)

Defendants seek to dismiss all of Plaintiff's section 1983 claims. (City's Mem. 16–19.)

Under section 1983, individuals may bring a private cause of action against persons acting "under color of state law" to recover money damages for deprivations of their federal or constitutional rights. *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 55 (2d Cir. 2014) (quoting 42 U.S.C. § 1983). To establish a viable section 1983 claim, a plaintiff must show "the violation of a right secured by the Constitution and laws of the United States" and that "the alleged deprivation was committed by a person acting under color of state law." *Vega*, 801 F.3d at 87–88; *see also Collymore v. City of New York*, 767 F. App'x 42, 45 (2d Cir. 2019) (quoting *Vega*, 801 F.3d at 87–88).

---

[9]  Tenke argues that he is entitled to absolute immunity and qualified immunity with respect to the abolition of Plaintiff's job because, respectively, (1) he was acting in a legislative capacity in proposing the budget that eliminated Plaintiff's position, and (2) Plaintiff "failed to allege the violation of any clearly established constitutional or statutory rights." (Tenke's Mem. 14–18.) Because there is no aiding and abetting liability, the Court declines to address the issue of Tenke's immunity arguments for the purposes of Plaintiff's NYSHRL claims.

[10]  Plaintiff seeks to amend the Complaint to assert a Fourteenth Amendment retaliation cause of action against the City, which she omitted due to an "apparent drafting oversight." (*See* Decl. of Matthew Weinick ¶ 7, Docket Entry No. 16.) The Court grants Plaintiff's request to amend her Complaint and file an Amended Complaint asserting the Fourteenth Amendment retaliation claim against the City, as there is no prejudice in light of the similar section 1983 claims brought against it under *Monell*.

### i.    Tenke's claims of legislative and qualified immunity

Tenke argues that he is entitled to legislative immunity and qualified immunity based on the abolition of Plaintiff's job because, respectively, (1) he was acting in a legislative capacity in proposing the budget that eliminated Plaintiff's position, and (2) Plaintiff "failed to allege the violation of any clearly established constitutional or statutory rights." (Tenke's Mem. 14–18.)

Plaintiff argues that (1) legislative immunity cannot be used to insulate "bad actors from unlawful employment decisions," (Pl.'s Tenke Opp'n 9–11), and (2) qualified immunity does not apply because Tenke violated clearly established laws, (*id.* at 11–13).

### 1.    Legislative immunity

Legislative immunity shields an official from liability if the act in question was undertaken "in the sphere of legitimate legislative activity." *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir. 2003) (quoting *Bogan v. Scott–Harris*, 523 U.S. 44, 54 (1998)). The Supreme Court has established that under the functional test of absolute legislative immunity, "whether immunity attaches turns not on the official's identity, or even on the official's motive or intent, but on the nature of the act in question." *Olma v. Collins*, 499 F. App'x 98, 100 (2d Cir. 2012) (quoting *Almonte v. City of Long Beach*, 478 F.3d 100, 106 (2d Cir. 2007)) (citing *Bogan*, 523 U.S. at 54–55); *see also S. Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 547, 559 (D. Conn. 2008) ("The enforcement policies may have been flawed, and the [d]efendant [c]ommissioners may have acted in bad faith, as is alleged by the [p]laintiffs, but legislative immunity is absolute and does not depend on these considerations.").

Legislative immunity covers all aspects of the legislative process, including "[m]eeting with persons outside the legislature — such as executive officers, partisans, political interest

groups, or constituents — to discuss issues that bear on potential legislation" and "participating in party caucuses to form a united position on matters of legislative policy [and] assist legislators in the discharge of their legislative duty." *Almonte*, 478 F.3d at 107 (concluding that "legislative immunity cloaks not only the vote on the budgetary resolutions, but also any [secret] discussions the [c]ouncil members may have held, and any agreements they may have made, regarding the new budget in the months preceding the actual vote"); *see also Bogan*, 523 U.S. at 55 (finding that the mayor's introduction of budget was legislative even though the mayor was an executive official); *Olma*, 499 F. App'x at 100 (holding that the appellants acted in a legislative capacity "when they prepared and submitted to the [c]ity [c]ouncil the proposed budget amendment and accompanying memo suggesting elimination of the position filled by [the appellee]"); *Anderson Grp., LLC v. City of Saratoga Springs*, 557 F. Supp. 2d 332, 345 (N.D.N.Y. 2008) ("[T]o the extent the board defendants partook in the [c]ouncil's zoning decisions by voting on and issuing zoning recommendations to the [c]ouncil, they are also entitled to legislative immunity."), *aff'd in part sub nom. Anderson Grp., LLC v. Lenz*, 336 F. App'x 21 (2d Cir. 2009).

However, legislators are not immune from suit for administrative acts. *See Manzi v. DiCarlo*, 982 F. Supp. 125, 129 (E.D.N.Y. 1997). Acts are administrative if they "'impact . . . particular individuals rather than . . . a community,' or [if] 'the factors considered in adopting the legislation relate to specific individuals, instead of general policy implications.'" *Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1219–20 (2d Cir. 1994) (quoting *Orange Lake Assocs., Inc. v. Kirkpatrick*, 825 F. Supp. 1169, 1174 (S.D.N.Y. 1993)); *Anderson Grp., LLC*, 557 F. Supp. 2d at 345 (holding that downzoning of a region "was a purely legislative act" but that "action[s] taken on the [plaintiff's] special use permit by the [b]oard [were] administrative in nature . . . [even though they] had implications for the public at large"). "[P]ersonnel decisions .

. . are administrative, and therefore not immune to liability, if they are directed at a particular employee and do not adopt or implement a broader legislative policy." *Bierce v. Town of Fishkill*, 656 F. App'x 550, 554 (2d Cir. 2016).  In *Bierce*, the board voted to eliminate two positions from the police department, citing budgetary concerns, affecting "just two employees." *Id.*  The Second Circuit found that the board was not entitled to legislative immunity.  *Id.*  The *Bierce* court distinguished *Bogan*, 523 U.S. at 46–47, where the elimination of an employee's position "occurred as part of a larger budgetary package that proposed freezing the salaries of all municipal employees and eliminating 135 positions."  *Id.*

As the Supreme Court has explained, the purpose of legislative immunity is to protect legislators from "deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good."  *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). Consequently, when sued in their personal capacity, "[l]ocal legislators, like their counterparts on the state and regional levels, are entitled to absolute immunity for their legislative activities." *Almonte*, 478 F.3d at 106 (citing *Bogan*, 523 U.S. at 49).  However, local governments, municipalities, or officials sued in their official capacity are not entitled to legislative immunity. *See Olma*, 499 F. App'x at 100; *Almonte*, 478 F.3d at 106 ("Immunity, either absolute or qualified, is a *personal* defense that is available only when officials are sued in their individual capacities; '[t]he immunities [officials] enjoy when sued personally do not extend to instances where they are sued in their official capacities.'" (alterations in original) (quoting *Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999), *abrogated on other grounds by Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012))); *Goldberg v. Town of Rocky Hill*, 973 F.2d 70, 73–74 (2d Cir. 1992) (explaining that an official-capacity claim is in substance a claim against the municipality, which cannot assert immunity, either absolute or qualified, as a defense to liability

under section 1983); *Cincotta v. Hempstead Union Free Sch. Dist.*, 313 F. Supp. 3d 386, 403 (E.D.N.Y. 2018) (stating that legislative immunity is limited to personal suits based on legislative acts).

Tenke is not entitled to absolute legislative immunity for the claim against him in his individual capacity. In October of 2020, Tenke told Plaintiff that he would be eliminating her position from the 2021 budget without conferring with the City Council, and Plaintiff was the only department head terminated. (Compl. ¶¶ 101–03.) Although Tenke asserted that layoffs were the only solution in light of the City's budget issues, only five other employees were "slated for layoff," and none of them were department heads. (*Id.* ¶¶ 104, 109–10.) In contrast to the facts of *Bogan*, Defendants do not allege any mass freezing or the elimination of multiple positions other than Plaintiff's and those of five other low-level employees. *Bogan*, 523 U.S. at 46–47. In fact, similar to *Bierce*, the 2021 budget terminated only a handful of individuals. *Bierce*, 656 F. App'x at 554. Further, even before Tenke's decision to eliminate Plaintiff's position in October of 2020, Tenke had announced in November of 2019 that Plaintiff would not be working for the City the following year, prior to the alleged budget crisis created by the Covid-19 pandemic, (Compl. ¶¶ 78–80), and while there was still an "economic boom" and not even "a hint of the coming economic stresses caused by the pandemic," (*id.* ¶ 81). In view of the fact that Tenke told Plaintiff as early as November of 2019 that she would be terminated and not working for the City the following year and then told her on October 9, 2020 that he would be eliminating her position from the 2021 budget before conferring with the City Council, and because Plaintiff was the only department head whose position was eliminated, and only six employees in total were slated for layoff, Plaintiff has plausibly alleged that Tenke's actions were specific to Plaintiff rather than legislative in nature. *See Orange Lake Assocs., Inc.*, 21 F.3d

41

at 1219–20 (stating that legislative immunity is unavailable where legislation relates to "specific individuals, instead of general policy implications"); *cf. Lorusso v. Borer*, 359 F. Supp. 2d 121, 128 (D. Conn 2005) (finding that the mayor was entitled to legislative immunity where his recommendation of the budget "eliminate[d] an entire class of job and job title, which has consistently been afforded absolute legislative immunity"). Further, even if Tenke acted in good faith, what matters is the nature of the act, rather than the motive or intent of the official performing it. *See Bogan*, 523 U.S. at 54–55 (holding that legislative immunity does not depend on motive or intent); *Olma*, 499 F. App'x at 100 (stating that the test for determining legislative immunity does not depend on the official's identity, motive, or intent, but the nature of the act in question).

Accordingly, Tenke is not entitled to legislative immunity.

## 2. Qualified immunity

"Qualified immunity protects government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Thus, pursuant to the two-step framework articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), when an official raises qualified immunity as a defense, the court must consider whether: '(1) . . . the official violated a statutory or constitutional right, and (2) . . . the right was "clearly established" at the time of the challenged conduct.'" *Id.* (citations omitted) (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)); *see also Chamberlain ex rel. Estate of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) ("Qualified immunity is available to officials so long as their actions do not violate 'clearly established statutory or constitutional rights of which

a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))); *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (same).  "To determine whether defendants enjoy qualified immunity, '[the court] consider[s] the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law.'"  *Chamberlain*, 960 F.3d at 110 (quoting *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014)).  "[G]overnment officials or employees who make decisions that are discretionary, but not judicial in nature, are entitled to qualified immunity unless there is bad faith or the action is taken without a reasonable basis."  *Sutter v. Dibello*, No. 18-CV-817, 2021 WL 930459, at *35 (E.D.N.Y. Mar. 10, 2021) (quoting *Russell v. Westchester Cmty. Coll.*, No 16-CV-1712, 2017 WL 4326545, at *13 (S.D.N.Y. Sept. 27, 2017)); *see Alhovsky v. Paul*, 406 F. App'x 535, 537 (2d Cir. 2011) ("New York law . . . grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." (alterations in original)); *Russell*, 2017 WL 4326545, at *13 (same).  Qualified immunity may only be granted at the motion to dismiss stage if "the facts supporting the defense appear on the face of the complaint . . . [and] 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'"  *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (quoting *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1484 (2d Cir. 1992)); *see also Brown v. Wetz*, No. 18-CV-11178, 2021 WL 964922, at *15 (S.D.N.Y. Mar. 15, 2021) ("Accordingly, it is not clear from the face of the complaint that [defendant], who is alleged to have discriminated against [the p]laintiff . . . , is entitled to qualified immunity.").

Tenke is not entitled to qualified immunity.  As discussed both above and further below, the right to be free from employment discrimination and retaliation "were all clearly established

at the time Tenke acted." (Pl.'s Tenke Opp'n 12 (citing *Heffernan v. City of Paterson*, 136 S.Ct. 1412, 1417–18 (2016); then citing *Vega*, 801 F.3d at 84; then citing *Kaytor*, 609 F.3d at 548–50; and then citing *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006)).) Because it does not "appear[] beyond doubt that [Plaintiff] can prove no set of facts in support of [her] claim that would entitle [her] to relief," the Court declines to grant qualified immunity to Tenke. *McKenna*, 386 F.3d at 436; *see Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 130 (2d Cir. 2004) (holding that individual defendants were not entitled to qualified immunity because it was "eminently clear" by 2001 that "individuals have a constitutional right to be free from sex discrimination"); *DiLegge v. Gleason*, 131 F. Supp. 2d 520, 522 (S.D.N.Y. 2001) (finding that the right to be "free from discrimination in employment" and the right to be free from retaliation were clearly established). The Court recognizes that although Tenke is "not entitled to qualified immunity on the face of the complaint . . . 'a factual basis for qualified immunity may arise as the proceedings develop.'" *Terranova v. New York*, 144 F. App'x 143, 146–47 (2d Cir. 2005) (quoting *Velez v. Levy*, 401 F.3d 75, 101 (2d Cir. 2005)); *see Brown*, 2021 WL 964922, at *15 (denying motion as to qualified immunity where it was "not clear from the face of the complaint" that defendant was entitled to qualified immunity); *Dipinto v. Westchester County*, No. 18-CV-00793, 2020 WL 6135902, at *11 (S.D.N.Y. Oct. 19, 2020) (same).

Accordingly, at this stage in the proceedings, the Court denies Tenke's motion to dismiss based on qualified immunity.

### ii. Personal involvement of Tenke

Tenke argues that Plaintiff fails to plausibly allege his personal involvement in alleged constitutional violations and therefore all of Plaintiff's claims brought against him under section 1983 should be dismissed. (Tenke's Mem. 12–13.) In support, Tenke argues that while he

proposed the budget that laid off Plaintiff and others, he did not vote on the budget, and the budget would have passed with or without his vote, as it was approved by members of the City Council.  (*Id.* at 12.)  In addition, Tenke contends that he cannot be liable for merely proposing a budget eliminating Plaintiff's position, as he did not have the power to unilaterally remove Plaintiff or refuse to reappoint her.  (Tenke's Reply 3.)

Plaintiff contends that because Tenke recommended Plaintiff's termination, he was involved in the deprivation of rights and thus is liable under section 1983.  (Pl.'s Tenke Opp'n 8–9.)  In support, Plaintiff argues that as mayor, Tenke has authority over employment issues, and, in any event, the City is not required to approve Tenke's budget, since "[i]f the council does not approve his budget by a date set by law, the budget becomes law."  (*Id.* at 8–9 & n.4.)

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Dubois v. Beaury*, No. 21-CV-2096, 2022 WL 1701497, at *4 (2d Cir. May 27, 2022) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *see Florence v. Seggos*, No. 21-834, 2022 WL 2046078, at *3 (2d Cir. June 7, 2022) ("To state a claim under section [1983] . . . the complaint must plausibly allege [the d]efendants' 'personal involvement' in the wrongful acts at issue." (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004))); *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) ("[T]he 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.'" (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)), *as amended* (Feb. 24, 2016).  A plaintiff must allege the direct participation or personal involvement of each of the defendants in the alleged constitutional deprivation.  *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010); *Farrell*, 449 F.3d at 484 (same).  As the Second Circuit has made clear, "there is no special rule for supervisory liability," and to find a state official liable

under section 1983, "a plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).  Being in the chain of command is not sufficient to satisfy personal involvement as the "violation must be established against the supervisory official directly."  *Id.*; *see also Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *33 (S.D.N.Y. Mar. 26, 2021) ("[I]n light of *Tangreti*, [the p]laintiff must establish that [the defendant] committed a constitutional violation through his own conduct, rather than through his supervision of [others].");  *Hunter v. Telefore*, No. 21-CV-78, 2021 WL 878745, at *3 (E.D.N.Y. Mar. 8, 2021) ("[T]he [Second] Circuit recently held that, following the Supreme Court's decision in *Iqbal*, a plaintiff must sufficiently allege a supervisory official's *direct* involvement in an alleged constitutional violation to state an actionable claim against that official." (emphasis in original) (citing *Tangreti*, 983 F.3d at 618).  Direct participation provides a basis of liability where the defendant personally participated with "knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (footnote omitted) (citing *Gaston v. Coughlin*, 249 F.3d 156, 165–66 (2d Cir. 2001)).

Plaintiff plausibly alleges that Tenke participated directly in her termination by recommending that her position be eliminated from the budget.  Tenke told Plaintiff in October of 2020 that he would be eliminating her position from the 2021 budget without conferring with the City Council, and even earlier, in November of 2019, had announced that Plaintiff would not be working for the City the following year.  (Compl. ¶¶ 101–02, 78, 80.)  When the City Council met and discussed Tenke's budget in October of 2020, several members "pointed out other ways to reduce costs" other than laying off Plaintiff and others, but Tenke rejected these alternatives.

(*Id.* ¶¶ 105–06.)  Even if, as Tenke claims, he abstained from the voting itself, (Tenke's Reply 3),

by proposing the budget and shaping the budgetary discussions of the City Council, Tenke

plausibly participated directly in the alleged constitutional violation, *see Tangreti*, 983 F.3d at

618, rather than simply being in the chain of command, *id*.[11]  Tenke's direct involvement in

proposing the budget that terminated Plaintiff plausibly alleges that "through [his] own

individual actions," he played a role in Plaintiff's alleged constitutional violations.  *Tangreti*, 983

F.3d at 618.

    Construing the facts in the light most favorable to Plaintiff, Plaintiff has plausibly alleged

Tenke's personal involvement for purposes of her section 1983 claims.

### iii.   First Amendment claims against Tenke and the City

    Defendants contend that Plaintiff "fail[s] to state a plausible retaliation claim under the

First Amendment based on [either] her perceived political affiliation [or her] gender

discrimination complaint."  (City's Mem. 10–15.)  They argue that Plaintiff's First Amendment

gender retaliation claim fails because (1) Plaintiff's complaint about alleged gender

discrimination was made in her position as an employee rather than a citizen and was therefore

not protected as it pertained only to her own situation, (2) the only adverse action Plaintiff claims

is her termination, and her claims that she was excluded from meetings and had a project

reassigned are not actionable, and (3) Plaintiff fails to plausibly allege causation.  (*Id.* at 14–15;

City's Reply 8–9.)  Defendants also argue that Plaintiff fails to sufficiently allege that she

suffered from political retaliation, because she does not allege that she "actually (or was

---

    [11]  Moreover, under the Glen Cove City Charter, the mayor is required to "present to the City Council a proposed budget for the ensuing fiscal year," and if the City Council fails to adopt the budget, it is the mayor's proposed budget which is considered to be adopted.  Glen Cove City Charter § C9-6.

perceived to have) participated in any political activity."  (City's Mem. 11; *see* Tenke's Mem. 1 ("[Plaintiff's] First Amendment political retaliation claim fails because she does not allege any political activity or affiliation for which she was allegedly retaliated against.").)

Plaintiff argues that because she complained of gender discrimination to the press, the complaint was protected by the First Amendment.  (Pl.'s City Opp'n 18.)  In addition, Plaintiff argues that Defendants terminated her after they formed a belief that she was "conducting political operations against them."  (*Id.* at 15–20.)  In support, Plaintiff contends that "Defendants believed that Belyea's complaint of discrimination was a political attack launched with the assistance of a 'known political operative,'" and believed the press release "was an example of partisan politics" and came "directly from the campaign manager of the Republican slate."  (*Id.* at 17.)

"To survive a motion to dismiss, a plaintiff claiming that he was retaliated against in violation of the First Amendment must plausibly allege that (1) he engaged in speech or activity that was protected by the First Amendment; (2) he suffered an adverse employment action; and (3) a causal connection existed between the adverse action and the protected activity."  *Specht v. City of New York*, 15 F.4th 594, 599–600 (2d Cir. 2021) (citing *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015)); *see Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)) (same); *see also Eyshinskiy v. Kendall*, 692 F. App'x 677, 677–78 (2d Cir. 2017); *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008).  "To establish a First Amendment retaliation claim for political association in the public employment context, a plaintiff must show that: (1) he was engaged in protected activity; (2) he suffered an adverse employment decision; and (3) there was a causal connection between the protected activity and the adverse employment

48

decision." *Bierce*, 656 F. App'x at 552; *see Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114

(2d Cir. 2011) (stating the three-part test for First Amendment political retaliation).

### 1. First Amendment retaliation claim on the basis of Plaintiff's gender discrimination complaint

#### A. Plaintiff sufficiently alleges that she engaged in protected speech when she issued a press release

The Supreme Court has instructed courts to conduct a two-step inquiry into whether a

public employee's speech is entitled to protection:

> The first [step] requires determining whether the employee spoke as
> a citizen on a matter of public concern. If the answer is no, the
> employee has no First Amendment cause of action based on his or
> her employer's reaction to the speech. If the answer is yes, then the
> possibility of a First Amendment claim arises. The question [then]
> becomes whether the relevant government entity had an adequate
> justification for treating the employee differently from any other
> member of the general public.

*Lane v. Franks*, 573 U.S. 228, 237 (2014) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418

(2006)). Thus, the First Amendment protects a public employee from retaliation by his or her

employer for the employee's speech only if the employee speaks "[1] as a citizen [2] on a matter

of public concern.'" *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (alterations in original)

(quoting *Garcetti*, 547 U.S. at 418); *see Specht*, 15 F.4th at 600 ("The speech of a public

employee is protected by the First Amendment when the employee speaks as a citizen on a

matter of public concern, rather than pursuant to his employment responsibilities."); *Montero v.*

*City of Yonkers*, 890 F.3d 386, 395 (2d Cir. 2018) (same); *see also Eyshinskiy*, 692 F. App'x at

678 ("The first inquiry encompasses two separate questions: '(1) whether the subject of the

employee's speech was a matter of public concern and (2) whether the employee spoke as a

citizen rather than solely as an employee. If the answer to either question is no, that is the end of

the matter.'" (citation omitted) (quoting *Matthews*, 779 F.3d at 172)); *Garcia v. Hartford Police*

*Dep't*, 706 F.3d 120, 129–30 (2d Cir. 2013) ("[T]he plaintiff must show that . . . the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest . . . ."); *Best Payphones Inc. v. Dobrin*, 410 F. Supp. 3d 457, 474 (E.D.N.Y. 2019) (same).

### (1)   Plaintiff's internal complaint

Plaintiff has not sufficiently alleged that her internal letter to a City personnel officer complaining of gender discrimination against her was made as a citizen on a matter of public concern.  Her letter "detail[ed] . . . [her] mistreatment from January [of] 2018 to [October of 2019]," and alleged that "[her] treatment was based on 'gender bias.'"  (Compl. ¶ 64.)  This does not constitute protected speech, since Plaintiff was complaining of a personal matter as an employee.  *See Corrado v. N.Y. State Unified Court Sys.*, No. 12-CV-1748, 2014 WL 4626234, at *10 (E.D.N.Y. Sept. 15, 2014) ("Complaints of gender discrimination in the workplace are not matters of 'public concern' where they relate to a personal employment grievance." (citing *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993))).  This internal complaint "does not pertain to a matter of public concern" because it is "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of [her] employment."  *Sousa v. Roque*, 578 F.3d 164, 174 (2d Cir. 2009) (quoting *Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir. 1999)).  Other than one generalized paragraph alleging a "serious and dangerous pattern" of gender discrimination, (Compl. ¶ 65), Plaintiff does not allege that she raised other concrete instances of general discrimination in her letter, other than her personal experiences.  *See Spencer v. Philemy*, 540 F. App'x. 69, 70 (2d Cir. 2013) ("Among the relevant considerations is whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." (quoting *Singer*, 711 F.3d at 339)); *see also MacFall v. City of Rochester*, 495 F. App'x 158,

160–61 (2d Cir. 2012) (stating that speech is not protected if it is "merely 'calculated to redress personal grievances'" (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008)); *Peterson v. N.Y.C. Dep't of Educ.*, No. 18-CV-1515, 2020 WL 2559835, at *8 (E.D.N.Y. May 20, 2020) ("[W]hile the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize [their] employee grievance[s]." (alterations in original) (quoting *Garcetti*, 547 U.S. at 420)); *Adams v. N.Y. State Educ. Dep't*, 705 F. Supp. 2d 298, 302–03 (S.D.N.Y. 2010) (holding that the plaintiff's speech was not protected where it "concerned personal grievances"); *cf. Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006) (finding that the plaintiff's letters to the police chief constituted protected activity where plaintiff specifically detailed instances of discrimination that affected other Hispanic officers). The fact that Plaintiff sent the letter to her employer further indicates that the letter is not a matter of public concern. "[A] petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 95 (2d Cir. 2020) (quoting *Borough of Duryea, Penn. v. Guarnieri*, 564 U.S. 379, 398 (2011)).

Thus, Plaintiff's internal letter was not protected speech.

### (2)  Plaintiff's press release

#### 1.  Plaintiff plausibly spoke as a citizen

The Court finds it plausible that Plaintiff spoke as a citizen, rather than as a public employee, in issuing a press release, which was issued separately from Plaintiff's internal complaint and spoke generally about sex discrimination in the workplace, a topic that did not fall under the scope of Plaintiff's employment duties. "[W]hen public employees make statements

51

pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Lane*, 573 U.S. at 237 (quoting *Garcetti*, 547 U.S. at 421).  "The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."  *Id.* at 240.

Plaintiff's issuance of a press release concerning sex discrimination and harassment of female City employees, (Compl. ¶ 61), written with a former City employee and with a friend involved in public relations, (*id.* ¶ 62), was not part of Plaintiff's "employment responsibilities" as Recreation Director, where her duties involved supervising the Parks Department, (*id.* ¶¶ 16, 31), staffing lifeguards for beaches, (*id.* ¶ 38), and renovating public facilities such as bathrooms, (*id.* ¶¶ 40–42).  *Specht*, 15 F.4th at 600.  There is no indication that this was "part-and-parcel" of Plaintiff's ability to exercise her "official duties" as Recreation Director.  *Montero*, 890 F.3d at 396 (quoting *Weintraub v. Bd. of Educ. of City School Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010))).

Plaintiff therefore plausibly spoke as a citizen for purposes of First Amendment protection when she issued a press release with a former City employee and a friend involved in public relations.

### 2.   Plaintiff spoke on a matter of public concern

The Court finds it plausible that Plaintiff's speech was made on a matter of public concern.  On October 2, 2019, Plaintiff and Clarson issued a press release concerning "ongoing sex discrimination and harassment of female City employees."  (Compl. ¶ 61); *see Bull v. Barone*, No. 03-CV-2034, 2008 WL 11491595, at *6 (D. Conn. Mar. 25, 2008) (finding that a statement released to the public complaining about working conditions and employment policies addressed "matters of public concern, not merely internal workplace grievances").  Plaintiff and

Clarson worked with a friend "experienced with public relations issues" to issue the press

release.  (Compl. ¶ 62.)

Considering the "content, form, and context" of the press release, the Court finds that it

arguably merits constitutional protection.  *Connick v. Myers*, 461 U.S. 138, 145–48 (1983).

Unlike the facts alleged about the internal letter, where Plaintiff "detail[ed]" her mistreatment on

the basis of gender, (*id.* ¶ 64), Plaintiff alleges that the press release "concern[ed] ongoing sex

discrimination and harassment of female City employees," including Clarson, (*id.* ¶ 61).  The

"intended audience" of Plaintiff's October 2, 2019, press release, which was the general public,

combined with the allegations about the content of the press release, indicate that Plaintiff sought

to "inform the public on a matter of political, social, or community interest."  *Specht*, 15 F.4th at

601; *cf. Pedrosa v. City of New York*, No. 13-CV-1890, 2014 WL 99997, at *12 (S.D.N.Y. Jan.

9, 2014) (finding that the plaintiff's complaints of workplace sexual harassment were not

protected where they "concerned only [the p]laintiff's own situation and did not hint at broader

problems").  Further, the fact that Plaintiff later sent an individual letter to the City's personnel

officer regarding her individual grievances also suggests that her press release was not

"calculated to redress personal grievances," but rather, had a broader public purpose.  *Lewis v.

Cowen*, 165 F.3d 154, 163–64 (2d Cir. 1999); *see Kantha v. Blue*, 262 F. Supp. 2d 90, 101

(S.D.N.Y. 2003) ("[C]omplaints concerning gender discrimination are protected if the employee

. . . sought 'relief against pervasive or systemic misconduct by a public agency or public

officials,' or her speech was 'part of an overall effort . . . to correct allegedly unlawful practices

or bring them to public attention." (quoting *Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412,

420 (7th Cir. 1988))); *Brennan v. Straub*, 246 F. Supp. 2d 360, 366 (S.D.N.Y. 2003) (denying

motion to dismiss where plaintiff's testimony on behalf of another female employee did not only

53

relate to the plaintiff's personal grievances).  Finally, *Newsday* reported on the story on October 17, 2019.  (Compl. ¶ 70); *see San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) ("These cases make clear that public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication.").

In view of the fact that Plaintiff spoke about "current government policies and activities," namely discrimination and harassment against female City employees, the Court finds that this served as a matter of public concern and that her speech was therefore protected.  *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003); *Gala v. City of New York*, 525 F. Supp. 3d 425, 430 (E.D.N.Y. 2021) (quoting *Johnson*, 342 F.3d at 112).

Accordingly, Plaintiff has sufficiently alleged that her press release was protected speech.

### B.   Plaintiff alleges that she suffered adverse employment actions

In the context of a First Amendment retaliation claim, "a public employee plaintiff alleging retaliation in violation of the First Amendment [need not] demonstrate a material change in employment terms or conditions."  *Zelnik*, 464 F.3d at 227.  Rather, the "standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in *Burlington Northern*"— that the action would dissuade a reasonable employee from speaking out.  *Id.*; *Specht*, 15 F.4th at 604 (same).  Put another way, an adverse action is one that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  *Nixon v. Blumenthal*, 409 F. App'x 391, 392 (2d Cir. 2010); *see A.S. v. City Sch. Dist. of Albany*, --- F. Supp. 3d ---, ---, 2022 WL 356697, at *14 (N.D.N.Y. 2022) ("In this context, an 'adverse action' is 'conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" (quoting *Cox*, 654 F.3d at 273)).  Examples of such actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay,

and reprimand," *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 510 (E.D.N.Y. 2011)

(quoting *Morris*, 196 F.3d at 110); *see Gunn v. Bescler*, No. 16-CV-6206, 2022 WL 563189, at

*9 (W.D.N.Y. Feb. 24, 2022) ("[V]ague intimations of some unspecified harm generally will not

rise to the level of adverse action for the purpose of a First Amendment retaliation claim."

(alteration in original) (quoting *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y.

2007))).  However, "lesser actions may also be considered adverse employment actions," since

"a combination of seemingly minor incidents [can] form the basis of a constitutional retaliation

claim once they reach a critical mass."  *Zelnik*, 464 F.3d at 226–27 (first quoting *Morris*, 196

F.3d at 110; and then quoting *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002)); *see Kiernan*

*v. Town of Southampton*, 734 F. App'x 37, 41–42 (2d Cir. 2018) ("'[L]esser actions may also be

considered adverse employment actions' such as a negative job evaluation.  Curtailment of job

responsibilities may also be adverse." (internal citations omitted)).

Plaintiff sufficiently alleges that her termination and the threat of her termination are

adverse employment actions.  Defendants do not contest that Plaintiff's termination, which was

authorized in October of 2020 and made effective January of 2021, was an adverse action.  As

discussed above in addressing Plaintiff's Title VII retaliation claim, Tenke's announcement at a

meeting in November of 2019 that Plaintiff would be terminated is an adverse action for the

purposes of First Amendment retaliation, as it would deter a reasonable employee from

exercising her constitutional rights and is "more disruptive than a mere inconvenience or an

alteration of job responsibilities," particularly in light of the fact that Plaintiff was ultimately

terminated, as discussed above.  *Kessler*, 461 F.3d at 207 (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)).[12]

### C.   Plaintiff sufficiently alleges causation

"To permit an inference of causation, a plaintiff must show that the protected [speech] 'was a substantial motivating factor in the adverse employment action.'"  *Specht*, 15 F.4th at 605 (quoting *Morris*, 196 F.3d at 110); *Kiernan*, 734 F. App'x at 42 ("To demonstrate a causal connection a plaintiff must show that the protected speech [or conduct] was a substantial motivating factor in the adverse . . . action." (first alteration in original) (quoting *Smith*, 776 F.3d at 118)); *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167–68 (2d Cir. 2006) (same); *see also Monz v. Rocky Point Fire Dist.*, 519 F. App'x 724, 726 (2d Cir. 2013). "A causal relationship can be demonstrated either indirectly by means of circumstantial evidence, including that the protected speech was followed by adverse treatment, or by direct evidence of animus."  *Wrobel v. County of Erie*, 692 F.3d 22, 32 (2d Cir. 2012); *see also Specht*, 15 F.4th at 605 ("A plaintiff may prove causation by, among other things, showing that the adverse employment decision and the protected activity were close in time.  We have previously found the passage of up to six months between an adverse action and protected activity sufficient to permit an inference of causation." (citation omitted)); *Catanzaro v. City of New York*, 486 F. App'x 899, 902 (2d Cir. 2012) ("Where a plaintiff has not alleged a specific connection between protected speech and an adverse action, 'causality can be shown through a close temporal proximity between the employer's awareness of protected conduct and the adverse action.'"

---

[12]   Defendants also argue that Plaintiff's claims that she "was excluded from meetings and had a project reassigned from her are not actionable."  (City's Mem. 15.)  Plaintiff, however, only contends that termination and threats of termination were adverse actions for First Amendment purposes, and the Court only considers these actions.  (Pl.'s City Opp'n 19.)

(quoting *Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011))); *Monz v. Rocky Point Fire Dist.*,

853 F. Supp. 2d 277, 288 (E.D.N.Y. 2012) (holding that a plaintiff can establish a causal

connection that suggests retaliation by showing that the protected activity was close in time to

the adverse action, and "[t]here is no 'bright line to define the outer limits beyond which a

temporal relationship is too attenuated to establish a causal relationship,' and a court must

'exercise its judgment about the permissible inferences that can be drawn from temporal

proximity in the context of each particular case'" (alterations and citations omitted) (first

quoting *Gorman–Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001); and then

quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009))); *see also Callahan v. Hum. Res.*,

No. 20-CV-1881, 2022 WL 445819, at *2 (D. Conn. Feb. 14, 2022) ("[A plaintiff] can meet her

burden by alleging either direct evidence of retaliation, or indirect evidence that the adverse

employment decision and the protected activity were close in time.").  However, a plaintiff

cannot solely "rely on conclusory assertions of retaliatory motive to satisfy the causal

link."  *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004); *see also Whitfield v. Imperatrice*, 477 F.

App'x. 806, 809 (2d Cir. 2012) (finding causal connection not demonstrated for purposes

of First Amendment retaliation claim where plaintiff relied "solely on his own speculation,

which is insufficient to defeat a summary judgment motion" (citing *Davis v. New York*, 316 F.3d

93, 100 (2d Cir. 2002))).

As discussed above in relation to Plaintiff's Title VII retaliation claims, Plaintiff has

sufficiently alleged that there is a causal connection between the press release, issued in October

of 2019, and both the threat of her termination in November of 2019 and her ultimate termination

in October of 2020 and made effective in January of 2021 due to a pattern of antagonism and the

fact that Plaintiff was laid off at the first available opportunity.[13]

Accordingly, the Court denies Defendants' motions with regard to Plaintiff's First

Amendment retaliation claims on the basis of her press release.

## 2.   First Amendment political retaliation

"[A plaintiff's] political retaliation claims are analyzed in the same manner as all First

Amendment retaliation claims."  *Lorusso*, 359 F. Supp. 2d at 130–31 (citing *Konits v. Valley*

*Stream Cent. High Sch. Dist.*, 394 F.3d 121, 124 (2d Cir. 2005)). Affiliating oneself with a

political party is protected against retaliation by the First Amendment.  *See Elrod v. Burns*, 427

U.S. 347 (1976) (ruling that political affiliations are constitutionally protected from government

retaliation); *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005) ("A public employee

generally may not be dismissed on account of her party affiliation, because such action violates

the employee's First Amendment rights absent a showing that 'party affiliation is an appropriate

requirement for the effective performance of the public office involved.'" (quoting *Branti v.*

*Finkel*, 445 U.S. 507, 518 (1980))); *Camacho v. Brandon*, 317 F.3d 153, 160–61 (2d Cir. 2003)

(differentiating the protected affiliations of low-level political employers from the unprotected

affiliations of policymakers); *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995)

---

[13] For example, Plaintiff alleges that she was "stripp[ed]" of her responsibilities.
(Compl. ¶ 83).  Plaintiff also alleges that she was told that one of her employees responsible for a
major department project was reassigned to the DPW, (*id.* ¶ 84), that she was excluded from a
vendor meeting concerning contamination at one of the beaches under her supervision, (*id.* ¶ 85),
and that DPW employees demanded that Plaintiff turn over her files concerning the
contamination project, (*id.* ¶ 86).  Further, following the start of the Covid-19 pandemic, when
the City convened a meeting across departments to discuss the City's plan, Plaintiff was
excluded from this meeting and from the information provided at that meeting about the City's
Covid-19 response plan even though Plaintiff's department supervised events and sports leagues
with hundreds of participants.  (*Id.* ¶¶ 95–97.)

("As a general rule, public employees may not be dismissed for the exercise of their First Amendment rights.").

Plaintiff's claim of political retaliation fails, as she does not allege that she has engaged in any protected political activity.  Plaintiff does not allege that she is a member of any political party and in fact alleges that she worked "successfully" with four different administrations from both major political parties.  (Compl. ¶ 20.)  Plaintiff argues that Defendants "believed that [her] complaint of discrimination was a political attack launched with the assistance of a 'known political operative.'"[14]  (Pl.'s City Opp'n 17.)  However, Plaintiff does not allege that this press release was politically motivated, and although she was assisted by a Republican who had worked with a previous Republican administration, Plaintiff does not allege any political language in the press release, and there are no allegations that Defendants perceived her to be affiliated with the Republican Party.  Thus, Plaintiff fails to allege that she engaged in any political activity that would warrant retaliation.  *See Bierce*, 656 F. App'x at 551 (noting that plaintiff alleged that he had been demoted for politically supporting the town supervisor and supporting her reelection campaign); *Rusk v. N.Y. State Thruway Auth.*, 37 F. Supp. 3d 578, 585 (W.D.N.Y. 2014) ("Nevertheless, there is no evidence set forth that the [p]laintiff's political activity or background played any role in his termination. . . . The [p]laintiff offers mere speculation that the change in leadership . . . from Republican to Democratic served a role in his

---

[14]  Plaintiff alleges that Tenke retaliated against her because he perceived her as a "holdover" obstructionist employee.  (Compl. ¶ 116.)  However, Plaintiff does not allege that Tenke referred to *her* as a holdover, but instead used the term to refer to the "City controller's office, still headed by Clarson [in July of 2019]."  (*Id.* ¶¶ 51–52.)  Plaintiff also alleges that a Councilwoman made comments that the press release was "another example of partisan politics" and that the press release came "directly from the campaign manager of the Republican slate."  (*Id.* ¶ 71.)  However, this does not support Plaintiff's claim against Tenke or the City, particularly in view of the fact that the Councilwoman is not a Defendant to this suit and Plaintiff does not allege that the Councilwoman voted for the budget in question.

termination.") (dismissing plaintiff's political retaliation claim under section 1983); *Bearss v. Wilson*, No. 08-CV-248, 2010 WL 11523749, at *9 n.2 (D. Vt. Aug. 10, 2010) ("Even assuming these statements [in which the defendant alleged that the plaintiff was a 'political insider,' among others] were made . . . , they do not demonstrate that [the plaintiff] engaged in political affiliation worthy of First Amendment protection; nor are they sufficient to support [the plaintiff's] claim that [the defendant] viewed her as a political foe and attempted to terminate her as a result of such view."); *cf. Lorusso*, 359 F. Supp. 2d at 131 (finding that the plaintiff's speech was a matter of public concern "because the right to vote for [a] candidate of your choosing without fear of reprisal is a protected First Amendment right that implicates fundamental freedoms").

Plaintiff's reliance on *Heffernan*, 578 U.S. at 266, and *Morin v. Tormey*, 626 F.3d 40, 42 (2d Cir. 2010) is misplaced.  (*See* Pl.'s City Opp'n 16.)  In *Heffernan*, 578 U.S. at 268, an employee was demoted because a government official incorrectly believed that the employee had supported a particular candidate for mayor, a clearly political act.  As the Supreme Court found, the "Constitution prohibits a government employer from discharging or demoting an employee because the employee supports a particular political candidate." *Id.* at 270.  In *Morin*, the state judge defendant demanded that plaintiff, a clerk in the New York State Unified Court System, "provide negative information about [the Democratic candidate for state supreme court justice]" and emphasized that the Democratic candidate was running against "good Republican friends" of his.  626 F.3d at 42.  The defendant also asked the plaintiff whether she "was a good Republican." *Id.*  The court found that the plaintiff's refusal to "spy on judges during a judicial election" and "engage in political activity involving the courts," which led to her being fired, was political activity in light of the defendant's clear political aims and demand for political loyalty. *Id.* at 44.

The *Heffernan* court ruled that even though the employer had made a mistake about the employee's actual political affiliations, he could still bring a First Amendment retaliation claim based on how their perceptions affected him. 578 U.S. at 273. Notably, the Supreme Court assumed that the "activities that [the employee's] supervisors *thought* he had engaged in are of a kind that they cannot constitutionally prohibit or punish," namely joining, working for, or contributing to a political party or candidate. *Heffernan*, 578 U.S. at 270. The press release issued by Plaintiff regarding gender discrimination, while protected speech as discussed above, is not protected political activity. *See Pulizotto v. McMahon*, 406 F. Supp. 3d 277, 296 (S.D.N.Y. 2019) (finding the plaintiff's reliance on *Heffernan* misplaced because the "protected activity in *Heffernan* was picking up a political campaign sign, or 'joining, working for or contributing to the political party and candidates,'" and while the plaintiff's activities were "speculated" to be motivated by political affiliation, such speculation did not turn the activities into political activities). In addition, Plaintiff does not allege any demands for party loyalty or overt political demands, as in *Morin*. Further, while the court in *Morin* ruled that the "right to be free from retaliation based on political affiliation is not limited to members of an opposing political party," the plaintiff in that case "asserted her right not to be pressed into political activity," which does not mirror the facts that Plaintiff alleges. *Id.* at 44. These cases provide no support for Plaintiff's claim.

Accordingly, the Court grants Defendants' motions as to Plaintiff's First Amendment political retaliation claim.

### iv.  Fourteenth Amendment claims[15]

The City argues that Plaintiff's Fourteenth Amendment hostile work environment and retaliation claims are pre-empted by Plaintiff's Title VII claims because they are based only on the alleged violations of Title VII.  (City's Mem. 4–5.)

Plaintiff argues that her claims are not duplicative of her Title VII claims.  (Pl.'s City Opp'n at 6.)

"A [section] 1983 action may not . . . be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII."  *Patterson*, 375 F.3d at 225 (citing *Saulpaugh*, 4 F.3d at 143); *see also Williams v. Pa. Hum. Rels. Comm'n*, 870 F.3d 294, 300 (3d Cir. 2017) ("[E]very circuit to consider this exact question has held that, while a plaintiff may use [section] 1983 'as a vehicle for vindicating rights independently conferred by the Constitution,' Title VII . . . statutory rights cannot be vindicated through [section] 1983." (footnote omitted)); *Urli v. Town of Hempstead Sanitary Dist. No. 7*, No. 20-CV-0960, 2021 WL 4311141, at *6 (E.D.N.Y. Sept. 22, 2021) ("Section 1983 may not be used to enforce Title VII."); *Rivera v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, No. 19-CV-11624, 2020 WL 7496282, at *4 (S.D.N.Y. Dec. 21, 2020) (quoting *Patterson*, 375 F.3d at 225) (same).  However, a Title VII plaintiff is not precluded from bringing a "concurrent [section] 1983 cause of action," such as a claim for denial of equal protection, as long as the section 1983 claim is based on a "distinct violation of a constitutional right."  *Patterson*, 374 F.3d at 225 (first quoting *Gierlinger v. N.Y. State Police*, 15 F.3d 32, 34 (2d Cir. 1994); and then citing *Saulpaugh*, 4 F.3d at 143).

---

[15]  Other than arguing that he is entitled to immunity, as discussed above, Tenke does not address Plaintiff's Fourteenth Amendment claims against him.  (*See generally* Tenke's Mem.) The Court therefore only addresses the City's motion as to this claim.

Plaintiff brings a section 1983 claim to vindicate her rights under the Fourteenth Amendment but does not allege in the Complaint whether she brings an equal protection violation or a due process violation, thus failing to plead a "distinct" violation of a constitutional right. *Cf. Saulpaugh*, 4 F.3d at 143–44 ("[The Plaintiff] has properly grounded a [s]ection 1983 claim on the Equal Protection Clause . . ."); *Gierlinger*, 15 F.3d at 34 ("For example, in some circumstances a [section] 1983 claim may be properly grounded on a violation of the Equal Protection Clause of the Fourteenth Amendment based on sexual harassment in the workplace."); *Rivera*, 2020 WL 7496282, at *4 ("Plaintiff asserts four claims, all for alleged violations of the Equal Protection Clause of the Fourteenth Amendment brought pursuant to [section] 1983."). Plaintiff states in her opposition paper that her "equal protection rights" under the Fourteenth Amendment were violated, but does not plead this in her Complaint, or allege any accompanying facts. (Pl.'s Tenke Opp'n 12; *see* Pl.'s City Opp'n 5.)

Accordingly, the Court grants the City's motion and dismisses without prejudice Plaintiff's section 1983 claims brought under the Fourteenth Amendment.

### v.   The City's *Monell* liability

The City contends that Plaintiff fails to allege a section 1983 claim against it because she fails to plausibly state an underlying violation and fails to allege the actions of any final policymaking officials that resulted in her rights being violated. (City's Mem. 16–19.)

Plaintiff argues that the City is liable because the City could not have voted "absent Tenke's acts," making him a final policymaker, and the City itself acted through the acts of the City Council. (Pl.'s City Opp'n 20–23.)

To establish a municipal liability claim, a plaintiff is required to plead and prove three elements: "(1) an official policy or custom that (2) cause[s] [the plaintiff] to be subjected to (3) a

denial of a constitutional right." *Torcivia v. Suffolk County*, 17 F.4th 342, 354–55 (2d Cir. 2021)

(quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)); *Lucente v. County of*

*Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (same); *see also Frost v. N.Y.C. Police Dep't*, 980 F.3d

231, 257 (2d Cir. 2020) ("To establish liability under *Monell*, a plaintiff must show that he

suffered the denial of a constitutional right that was caused by an official municipal policy or

custom." (quoting *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019))).  A plaintiff

can establish an official policy or custom by showing any of the following: (1) a formal policy

officially endorsed by the municipality; (2) actions or decisions made by municipal officials with

decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom

of which policymakers must have been aware; or (4) a failure by policymakers to properly train

or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to

the rights of the plaintiff and others encountering those subordinates.  *McLennon v. City of New*

*York*, 171 F. Supp. 3d 69, 94 (E.D.N.Y. 2016); *see O'Kane v. Plainedge Union Free Sch. Dist.*,

827 F. App'x 141, 142–43 (2d Cir. 2020) (finding that failure to "take appropriate action to

prevent or sanction violations of constitutional rights" amounts to deliberate indifference

(quoting *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012))); *Iacovangelo v. Corr.*

*Med. Care, Inc.*, 624 F. App'x 10, 13–14 (2d Cir. 2015) (formal policy officially endorsed by the

municipality); *Matusick*, 757 F.3d at 62 (widespread and persistent practice); *Carter v. Inc. Vill.*

*of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate

indifference); *Jones*, 691 F.3d at 81 (policymaking official's "express" or "tacit" ratification of

low-level employee's actions).

  "In order to prevail against a municipality based on the acts of a public official, a § 1983

plaintiff must prove, inter alia, that the constitutional injury was caused 'pursuant to official

municipal policy of some nature,' or by a municipal policymaker with 'final policymaking power' over the challenged action." *Massena v. Bronstein*, 545 F. App'x 53, 55 (2d Cir. 2013) (citations omitted) (first quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); and then quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)); *see also Hines v. Albany Police Dep't*, 520 F. App'x 5, 7 (2d Cir. 2013) ("'[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly'; municipal liability, however, 'attaches where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" (alteration in original) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986))); *Schwab v. Smalls*, 435 F. App'x 37, 40 (2d Cir. 2011) (finding that plaintiff failed to sufficiently plead *Monell* liability where she did "not adequately allege[] that any of the individual defendants had final authority to establish municipal policy with respect to the hiring and firing of District employees"); *Missel v. County of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) ("To allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality.").  A plaintiff only needs to identify one action by a decisionmaker who possesses final authority to "establish municipal policy with respect to the action ordered may deprive the plaintiff of his or her constitutional rights." *Hu v. City of New York*, 927 F.3d 81, 105 (2d Cir. 2019) (quoting *Montero*, 890 F.3d at 403); *see Walker v. City of New York*, 974 F.2d 293, 296 (2d Cir. 1992) (holding that "a single act" could form the "basis of municipal liability . . . [s]o long as the single

challenged act was the decision of a municipal policymaker" (citing *Pembaur*, 475 U.S. at 480);

*Pignone v. Village of Pelham Manor*, No. 10-CV-2589, 2014 WL 929805, at *3 (S.D.N.Y. Mar.

6, 2014) ("Even one act by a municipal policymaker may constitute a municipal 'policy,' so long

as that policymaker possessed final authority to establish municipal policy in the area at issue."

(citing *Pembaur*, 475 U.S. at 481–83)); *Canzoneri v. Inc. Vill. of Rockville Ctr.*, 986 F. Supp. 2d

194, 204 (E.D.N.Y. 2013) ("It is well settled that municipal liability may be established based on

the single acts of a municipal official with 'final policymaking authority.'" (collecting cases)).

"The question of whether an official has final policymaking authority is a question of law."

*Massena*, 545 F. App'x at 55; *see Agosto*, 982 F.3d at 98 ("Whether the official in question

possessed final policymaking authority is a legal question." (citing *Jeffes v. Barnes*, 208 F.3d 49,

57 (2d Cir. 2000))).

　　For the purposes of municipal liability, Tenke's proposed budget, which eliminated

Plaintiff's position, was the decision of a "municipal official[] with decision-making authority"

because of his final authority throughout the budgetary process. *McLennon*, 171 F. Supp. 3d at

94; *Iacovangelo*, 624 F. App'x at 13–14; *see Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45

(2d Cir. 1983) ("Where an official has final authority over significant matters involving the

exercise of discretion, the choices he makes represent government policy."). Tenke proposed the

budget and plausibly had final authority throughout the process; for example, during the budget

decision process, several council members proposed ways to reduce costs other than terminating

positions such as Plaintiff's, but Tenke rejected those alternatives as "not viable." (Compl. ¶

106.) Further, it was Tenke who told Plaintiff he was eliminating her position from the 2021

budget. (*Id.* ¶ 101.) He plausibly was a final policymaker for the 2021 budget terminating

Plaintiff's position. *See Gronowski*, 424 F.3d at 296–97 ("[The mayor's] actions undoubtedly

represent government policy.  Because he has final authority over hiring and firing decisions, which are discretionary matters, his decisions in this area constitute the municipality's final actions."); *Chiaravallo v. Middletown Transit Dist.*, No. 18-CV-1360, 2019 WL 4278937, at *9 (D. Conn. Sept. 10, 2019) ("Although the [c]ity's [c]harter may limit [the mayor's] authority. . . [the plaintiff] plausibly alleges that [the mayor's] actions circumvented any limitation on his power . . . and therefore constituted a 'policy' under Section 1983."); *Festa v. Westchester Med. Ctr. Health Network*, 380 F. Supp. 3d 308, 323 (S.D.N.Y. 2019) ("[The p]laintiff alleges that she was told [the executive officer] made the decision to terminate [the p]laintiff's employment, suggesting he has final authority over hiring and firing decisions. . . . At the motion-to-dismiss stage, [the p]laintiff's allegation that [the executive officer] has authority over firing decisions is sufficient to assert liability for her allegedly unlawful termination.").  Thus, in crafting the 2021 budget, Tenke made "a deliberate choice . . . from among various alternatives," *Hines*, 520 F. App'x at 7, and therefore was responsible for establishing final government policy with respect to budgetary decisions for the City, *Agosto*, 982 F.3d at 98.  While Tenke may not have had a vote on the proposed budgets under the City Council, (*see* City Charter § C2-4(E)), his itemized budget containing the elimination of Plaintiff's position plausibly was the "act of a person with policymaking authority for the municipality."  *Missel*, 351 F. App'x at 545 ("To allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." (citing *Vives v. City of N.Y.*, 524 F.3d 346, 350 (2d Cir. 2008))).

Accordingly, Plaintiff has plausibly alleged a *Monell* claim and the Court therefore denies Defendants' motion to dismiss the claim.

### f.  Punitive damages

Tenke argues that the Court should strike Plaintiff's request for punitive damages, as Plaintiff fails to assert any facts plausibly alleging that he acted with "evil motive or intent" or "reckless or callous indifference."  (Tenke's Mem. 18 (quoting *Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 52 (2d Cir. 2003)).)  The City argues that as a government entity, it is immune from punitive damages.  (City's Mem. 19.)

Plaintiff argues that punitive damages should not be dismissed on a motion to dismiss. (Pl.'s Tenke Opp'n 13.)

Because punitive damages are a form of damages, and not an independent cause of action, a motion to dismiss a prayer for relief in the form of punitive damages is "procedurally premature."  *Jones v. City of New York*, No. 18-CV-1937, 2020 WL 1644009, at *17 (S.D.N.Y. Apr. 2, 2020) (quoting *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 220 (S.D.N.Y. 2019)) (denying defendants' motion to dismiss plaintiff's request for punitive damages on the grounds that a motion to dismiss is addressed to a claim and not to a form of damages); *see Bernardi v. N.Y. State Dep't of Corr.*, No. 19-CV-11867, 2021 WL 1999159, at *14 (S.D.N.Y. May 19, 2021) (denying motion to dismiss as premature with respect to plaintiff's punitive damages claims).

The Court therefore denies Defendants' motion with respect to Plaintiff's punitive damages claim.

## III.  Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to dismiss.  The Court dismisses Plaintiff's NYSHRL claim against Tenke, First Amendment political retaliation claim against Tenke and the City, and Fourteenth Amendment claims against the City, without prejudice.  The Court denies Defendants' motions with respect to Plaintiff's Title VII retaliation and hostile work environment claims against the City and First Amendment retaliation claim brought under section 1983 against Tenke and the City on the basis of her gender discrimination complaint.  The Court also denies Defendants' motion with respect to Plaintiff's punitive damages claim.  The Court grants Plaintiff's request to amend her Complaint to include a Fourteenth Amendment retaliation claim against the City.

Dated:  August 22, 2022
        Brooklyn, New York


                            SO ORDERED:


                            ___s/ MKB_____
                            MARGO K. BRODIE
                            United States District Judge